[Mr. Justice Lewis was absent, during the whole of this term.]

---

## VANDENHEUVEL *against* THE UNITED INSURANCE COMPANY.

In an action on a policy of insurance, containing a warranty of American property, it was held, that the sentence of a foreign Court of Admiralty, condemning the property as lawful prize, was conclusive evidence as to the character of the property, and of the breach of the warranty.(a)

It is a general rule that whenever a matter comes to be tried in a collateral way, the final sentence of any court having competent authority, is conclusive evidence of the matter so determined in all other courts having concurrent jurisdiction. Per *Kent*, J.

The effect of judgments of courts having *peculiar* jurisdiction of the subject matter considered. Per *Kent*, J.

THIS was an action on a policy of insurance, on the freight of the "American ship, called the Astrea, from New York to Corunna." The cause was tried at the last March circuit, in the city of New York, when a verdict was taken for the plaintiff, for 4365 dollars and 6 cents, subject to the opinion of the court, on the following case, which it was agreed either party might turn into a special verdict.

(a) Reversed in error, *infra*, 451. See *Ludlow* v. *Dale*, 1 J. C. 16; *Goix* v. *Low*, id. 341.

The defendants, for a premium of 15 per cent. on the 9th March, 1798, insured 4000 dollars, valued at that sum on the freight.

[*128]     *The insurance was effected, in consequence of the following written application from the plaintiff to the defendants, dated 14th November, 1798.

·  " Gentlemen,

" What will be the premium on the ship, freight, and cargo, of the Astrea, captain Price, consisting in mahogany, tobacco, slaves, dye-woods, and sugar, at and from New York to Corunna, to sail in eight days; property of the undersigned.

" I. C. Vandenheuvel."

The Astrea was captured, during her voyage, by a British frigate, and, with her cargo, was condemned as lawful prize, to the captors, by the court of vice-admiralty, at Gibraltar, "as belonging, at the time of her capture, to Spain, or to persons being subjects to the king of Spain, or inhabiting within the territories of the king of Spain, enemies to the king of Great Britain."

The freight insured was lost by the capture and condemnation, and duly abandoned to the defendants, with the usual proof of loss and interest.

Unless the court should think the plaintiff concluded, by the sentence of condemnation, it was to be received as a fact in the case, that the ship and cargo were really the plaintiff's property; and that the ship was registered, and had all the usual documents of an American vessel.

The plaintiff was born a subject of the United Netherlands, and continued so, until the 3d day of June, 1793, when he became a naturalized citizen of the United States. That he was a Dutchman, was a fact known to the defendants, at the time of subscribing the policy.

It was agreed, that if the court should be of opinion, that the plaintiff is entitled to recover for a total loss, judgment was to be rendered on the verdict, as it stood. But if the opinion of the court should be, that there should be
[*129]    only a *return of premium, judgment should be en-

tered for the plaintiff for the sum of 700 dollars. But if nothing, in their opinion, ought to be recovered, judgment was to be given for the defendants.

The defendants also underwrote a separate policy on the cargo of the same vessel for the same voyage, on which a verdict was also taken for the sum of 15,000 dollars, subject to the opinion of the court in the other cause.

*Hamilton* and *B. Livingston*, for the plaintiff.

*Harison* and *Troup*, for the defendant.

RADCLIFF, J. This was an insurance on the freight of the Astrea, from New York to Corunna, in Spain, The policy was subscribed by the defendants on the 19th November, 1798, in consequence of a written representation from the plaintiff, stating the ship, freight and cargo to be his property.

The plaintiff was originally a subject of the United Netherlands and continued so until the 3d January, 1793, when he was naturalized as a citizen of the United States. He must of course, have emigrated to America, at least two years antecedent to that period, and before the United Netherlands were involved in the late European war, and he is stated to have been personally known to the defendants.

The vessel during the voyage was captured by a British frigate, as a prize, carried to Gibraltar, and with her cargo, there condemned by the court of vice-admiralty, on the ground of her " belonging, at the time of her capture, to Spain, or to persons being subjects of the king of Spain, or inhabiting the territories of the king of Spain, enemies of Great Britain." From the situation of the plaintiff, and the representation of the defendants, the insurance must be considered as made upon American or *neutral property*. The representation is, to this purpose, equivalent to a warranty of that fact, and liable to the same result.(*a*) In my view of the subject two questions arise.

(*a*) The breach of a warranty consists either in the falsehood of an *affirmative* or the non-performance of an *executory* stipulation, in either case the contract is void *ab initio*, the warranty being a condition precedent ; and whether the thing warranted was material or not, whether the breach of it proceeded

[*130]   *1st. Whether, upon the *terms of the contract*, the plaintiff is entitled to recover ?

from fraud, negligence, misinformation, or any other cause ; the consequence is the same. The warranty makes the contract hypothetical; that is, it shall be binding if the warranty be complied with. With respect to the compliance with warranties, there is no latitude, no equity ; the only question is, has the thing warranted taken place or not ? If not, the insurer is not answerable for any loss even though it did not happen in consequence of the breach of the warranty. *Hibbert* v. *Pigou*, cited in Marshall on Ins. 375. *Woolmer* v. *Muilman*, 3 Burr. 1419. If the thing insured is represented in the policy as belonging to the subjects of a neutral state it is equivalent to a warranty ; *Lothian* v. *Henderson*, 3 B. & P. 499 ; *Walton & Pagan* v. *Bethune*, MSS. commented on in 1 Tr. Con. Rep. 381 ; but if the interest of one joint owner of a cargo be insured, and if that interest be neutral it is no breach of the warranty of neutrality, if the other joint owner whose interest be not insured be a belligerent, for the assured are not understood to warrant that the whole cargo is neutral, but that the *interest insured* is neutral. *Livingston* v. *Maryland Ins. Co.* 6 Cranch, 274. Neutral property in the sense in which that expression must be understood in this warranty, is that which belongs to the subjects of a state in amity with the belligerent powers ; Marshall on Ins. 390 ; and this is to be determined by the domicil of the owner. *Arnold* v. *United Ins. Co.* 1 J. C. 368. *Johnson* v. *Ludlow*, 2 id. 481. S. C. 1 C. C. E. 29. *Jenks* v. *Hallett*, 1 Caines, 60, 64. *Livingston* v. *Maryland Ins. Co.* 7 Cranch, 506, 542. *The Venus*, 8 id. 278. *The Frances*, id. 235. *The Mary and Susan*, 1 Wheat. 46. *Abbott* v. *United Ins. Co.* 16 Johns. 128. *The Antonia Johanna*, 1 Wheat. 159. *The Friendschaft*, 4 id. 105. *Tabbs* v. *Bendelack*, 4 Esp. N. P. 108. *Baring* v. *Claggett*, 3 B. & P. 207. *Wilson* v. *Marryatt*, 8 T. R. 31. *Albretcht* v. *Sussmann*, 2 Ves. & B. 323. *McConnell* v. *Hector*, 3 B. & P. 113. *Wissman* v. *So. Ca. Ins. Co.* 2 Rice's Dig. 21. Under a warranty in a policy of insurance that the ship and cargo are neutral property, it is sufficient that they are so when the risk commences ; *Eden* v. *Parkenson*, 2 Douglass, 732 ; *Tyson* v. *Gurney*, 3 T. R. 477 ; but any forfeiture of the obligations of neutrality by the act or omission of the assured or his agents after the commencement of the voyage insured is a breach of such warranty. *Garrels* v. *Kensington*, 8 T. R. 230. *Fitzsimmons* v. *The Newport Ins. Co.* 4 Cranch, 185. *Cleaveland* v. *Union Ins. Co.* 8 Mass. 308.

A warranty of national character imports that the *ship* shall be properly documented ; thus, a warranty that a ship is " *American*," imports that she is entitled to all the privileges of an American flag ; *Rich* v. *Parker*, 7 T. R. 705 ; *Kidd* v. *Walker*, 1 Dow. 331 ; *Bell* v. *Carstairs*, 14 East, 394 ; *Evereth* v. *Lunns*, 1 Stark. 508 ; and that it shall be provided and accompanied during the voyage with all the documents required by the general laws of nations or by particular treaties, so that she may not be liable to any impediment or inconvenience in the course of the voyage ; *Rich* v. *Parker*, 7 T. R. 709, 710 ; *Blagge* v. *N. Y. Ins. Co.* 1 Caines, 549 ; *Calhoun* v. *Ins. Co. of Penn.* 1 Binn. 293 ; *Griffith* v. *Ins. Co. of North America*, 5 id. 464 ; *Coolidge* v.

Vandenheuvel v. The United Insurance Company.

2d. Whether, in respect to the *fact of neutrality*, he is *concluded* by the foreign sentence ?

If upon the contract he would be entitled to recover, and is not concluded by the sentence, it is conceded or offered to be proved, that the property was in reality neutral, or such as was so represented by the defendants.

The second question has already been twice determined in this court; first, in the case of *Ludlow* v. *Dale*, (1 Johns. Cas. 16,) in which I gave no opinion, it having been argued

*N. Y. Fireman Ins. Co.* 14 Johns. 308 ; but there is no implied warranty on the part of the owner of goods that they shall be in all respects properly documented.  *Carrathers* v. *Gray*, 3 Camp. 142 ; 15 East, 35.

In *Lothian* v. *Henderson*, 3 B. &. P. 524, Mr. Justice Lawrence said : " A warrant of neutrality must, I conceive, now be understood as containing in itself, amongst other things, a stipulation, that the contract of assurance shall be void if the subject matter warranted neutral be condemned as enemies' property ; and if a warrant of neutrality contains this stipulation, the sentence of a court of competent jurisdiction, condemning a ship on account of its want of neutrality is the proper evidence according to every principle and rule of our laws to determine that fact."

Mr. Duer in considering Mr. Marshall's definition of a representation, (1 Marshall on Ins. 450,) observes : " There are cases, in which a representation and a warranty, embracing the same facts, are the same in their legal construction and effect.  Such is the result where from the nature of the subject to which the representation relates, any change in the facts that it affirms or implies, must be material.  *Fillis* v. *Brutton*, 1 Park, 8 ed. p. 414.  1 Phillips, 206.  *Vandenheuvel* v. *United Ins. Co.* 2 Johns. Cas. 129.  *Macdowall* v. *Fraser*, Doug. 260.  *Bowden* v. *Vaughan*, 10 East, 450.  *Steele* v. *Lacy*, 3 Taunt. 285.  *Feise* v. *Parkinson*, 4 Taunt. 639.  *Edwards* v. *Footner*, 1 Camp. 530.  *Nonnen* v. *Kettlewell*, 16 East, 176.  *Von Tungeln* v. *Dubois*, 2 Camp. 151.  *Driscoll* v. *Passmore*, 1 B. & P. 200.  *Driscol* v. *Bovil*, id. 313.  *Alston* v. *Mech. Ins. Co.* 4 Hill, 344.  *Denniston* v. *Lillie*, 3 Bligh, 1st series, 202.  *Murray* v. *Alsop*, 3 Johns. Cas. 49.  *Kemble* v. *Bowne*, 1 Caines, 75.  *Suckley* v. *Delafield*, 2 Caines, 222.  *Callaghan* v. *Atlantic Ins. Co.* 1 Edw. Ch. R. 64.  *Alsop* v. *Coit*, 12 Mass. 401.  *Hazard* v. *New Eng. Ins. Co.* 1 Sumn. 211.  8 Peters, 557.  *Carpenter* v. *American Ins. Co.* 1 Story, 57.  3 Benecke, 314.  Thus it has been justly decided that a representation of neutrality is equivalent to a warranty.  It embraces the same facts, imposes the same duties, is violated by the same acts or circumstances.  A similar identity seems to subsist between a representation and a warranty, that the vessel, to which the insurance relates, will depart with convoy ; and certainly exists in other cases that will hereafter be mentioned."  Duer on Insurance, vol. 2, p. 647.

before I took my seat; and secondly, in the case of *Goix* v. *Low*. (1 Johns. Cas. 341.) In the last, although the subject, in some respects, presented itself to my mind in a different light, I was content to acquiesce in the opinion which had been previously delivered, considering the rule to have been definitively settled as far as depended on this court. The magnitude of the question has induced us to review it, in this and other causes, but notwithstanding the able and zealous discussion it has received, I can perceive no new lights to lead me to change my opinion.

It may be premised, that in the course of the argument much was said of the policy of the English courts in deciding this question in favor of the insurer, and the policy of our adopting a different rule. On a careful examination of the English decisions, I cannot discover any ground for this suggestion. They appear to rest on principles unconnected with any motive of policy, and are indiscriminately applied to their domestic as well as to foreign tribunals. If the consideration were proper in determining a rule for ourselves, I am unable to perceive its force or application.

In every instance of a foreign condemnation, a loss must necessarily happen. If the property be really American, and insured here, the burthen must fall on some of our citizens. It is then a question between them solely, and it can never be politic or just to seek to shift the loss from [*131] *one description of citizens to another. If the property be not American, and insured in this country, an interested policy, if such could be justified, would dictate an opposite rule of decision, and lead to protect the American insurer against the foreign owner, and thus determine the question against the insured.

Again, if the property be American, and insured abroad, the remedy is placed beyond the reach of our laws, and it would be a vain presumption in the courts of this or any other country to attempt to prescribe a rule for foreign tribunals. But I dismiss this topic as unconnected with the merits of the question. Opinions founded on policy are necessarily various and fluctuating, and ought never to actuate

a court of justice. The question, in every instance, must depend on its intrinsic merits arising from the nature of the contract and the general law of insurance, unless restrained by positive regulations.

In this view of the subject, the judicial determinations of courts in different countries, as well as the opinions of individuals, may differ, but the difference, I apprehend, can never, as has been imagined, become a matter of *national* concern. The regular administration of justice, when conducted with good faith, can never implicate the government with respect to foreign nations; and whatever rule may be established on this occasion, it cannot be considered as affecting the rights of our own citizens, as existing between them solely. If foreigners should at all be interested, it must happen in consequence of their voluntary act to seek insurance here, and they cannot complain of the conduct of our courts, if they receive the same measure of justice which is administered to others. I, therefore, equally lay out of view every argument derived from this source.

It is true there may be cases to interest the *government* in behalf of its citizens. When losses are sustained by the unjust sentences of foreign tribunals, there is no doubt but the party injured is entitled to apply to *his government* for redress; and that government, in case of *palpable injustice,* *has a right to demand and enforce repara-    [*132] tion from the sovereign of the aggressor; it is even bound to do so, or, in its discretion, to grant reprisals, or an indemnity to the injured party. It then, and not till then, becomes a question of *national* concern. As such, the delicacy and importance attached to it, as to all national questions, would require the government to proceed with caution, and in doubtful cases rather to presume that justice has been done, than to impeach the integrity of foreign courts. Thus it is held that it ought not to interfere but in cases of violent injuries, countenanced and supported by the *sovereign* of the aggressor, and where justice is absolutely denied, *in re minime dubia,* by all the tribunals, and in the last resort. (*Gro. de Jure, &c. lib.* 3, c. 2, s. 4, 5. 1 Coll. Jur, 102, 103.

Vat. 257, 258.) This is the language of the most approved writers on public law, and is professed to be the practice of all civilized nations; and one (Vattel in the report on the Prussian memorial) of those writers, perhaps the most eminent and correct, exemplifies the maxim by referring to the principles maintained by the British government on a similar occasion. Hence it will be admitted, as a general rule, that every government is bound to respect the judicial decisions of foreign courts, and in the first instance to consider them as just, and of course generally conclusive. But these reasons for the rule are strictly applicable to the government alone when acting in behalf of its citizens. They cannot apply to the conduct of our courts in the ordinary administration of justice. We actually see the courts of France and England differ on the very question before us, and it has never been deemed a subject of *national* complaint by either. I, therefore, think, that it is not on the ground of *national* interference or courtesy, that such sentences in our courts are held to be conclusive; their exclusive quality depends on other principles.

1st. As between the insurer and insured, in case of a representation or warranty of neutral property, I think a condemnation in a foreign court of admiralty, when [*133] founded *on the want of neutrality, operates definitively against the insured according to the terms and effect of the contract itself. During the existence of a maritime war, the state of commerce is necessarily more or less precarious. Neutrals are not exempt from this inconvenience, but neutrality, if respected, affords a great advantage. The neutral merchant, when he effects an insurance, may either retain the benefit of his neutrality, or, if diffident of its security, he may relinquish it; and specially insure his property against every possible loss. If he insure the property as neutral, he thereby signifies his intention to avail himself of his neutrality, and of course will pay a less premium; but in doing this it must follow that he takes upon himself the risk of that neutrality. He thus far *divides the risk*, and is to be considered his own insurer. He cannot by paying a

less premium, enjoy the benefit of his neutrality, and at the same time the benefit of an insurance for the want of it.

It is obvious that every such representation or warranty is made, not with a view to an examination of the fact in our own courts, but in reference to the parties at war, and to the danger of capture and condemnation abroad. This is the direct object of the stipulation. It cannot be limited to the naked position that the property is in fact neutral. It may be so and yet possess none of the *indicia* or evidences of neutrality. These evidences, it is not denied, the insurer undertakes shall accompany it, and I think he equally undertakes that it shall enjoy the privileges of neutrality.

There appears to me no room for the distinction, that the insured engages to furnish the evidences merely, and at the same time not to maintain his neutrality when it may be called in question. If the proper evidences accompany the subject, it is not legally to be presumed that its neutrality cannot be maintained. Whatever abuses may occasionally be committed, we cannot act judicially, nor suppose the parties to have acted, on the presumption of injustice in foreign courts. The idea is inadmissible when applied to
*the courts of a civilized nation, and if contemplated [*134] by the parties, ought at least to have been made the subject of a special provision in the contract. No doubt the underwriter may, by a special insurance, and the admission of a particular mode of proof, make himself liable, even for the unjust sentences of foreign courts; but he ought never to be held liable for such sentences, when proceeding on the very ground assumed by the insured himself. If neutrality can be called a risk, that risk is necessarily implied in the warranty; and the insurer, by the contract, is liable only to the remaining perils incident to the subject, allowing it to be neutral and to preserve that character. He engages for nothing more; and his premium must be deemed proportioned to those perils only. The effect of the representation or warranty, can, I think, on the face of the contract itself, admit of no other interpretation.

If this reasoning be correct, it follows, that the insured,

having represented or warranted the subject to be neutral, can never, on the terms of the contract itself, recover against the insurer when it appears to have been condemned on a ground which denies its neutrality. It is immaterial, in this view of the subject, whether the condemnation be just or unjust; it is sufficient if it proceed on the want of neutrality.

2. The question in the English courts does not appear to have been examined in this light. They have been content to apply to the decisions of foreign courts of admiralty, a principle which has long been received and adopted in their domestic courts. They place them on the same footing, and consider the conclusivness of their sentences, as necessarily resulting from the right of jurisdiction. In relation to their own courts the rule has undoubtedly been long established, both before and since the revolution, and it is not confined to courts of peculiar or exclusive authority, but applies to all. Not only the sentences or judgments of their ecclesiastical or other courts, where they possess exclusive cognizance, but the decisions of all the courts, in \*cases where they have concurrent jurisdiction, are deemed to be equally conclusive. Indeed, a contrary position would involve the absurdity of a power competent to decide, and at the same time ineffectual in its decision.

[\*135]

They have also, in a variety of cases, extended the rule to foreign courts of a different description. Thus, a bill to be relieved against actions of trespass for seized goods, (1 Ch. Cas. 237 ; 26 Car. II,) in an island of Demark, was dismissed in chancery, because sentence was given in the court of Demmark on the seizure. So in case (12 Vin. 87, pl. 9 ; 2 Stra. 732, 733, S. C. best reported in Viner, 1726,) of a bill of exchange, the acceptance of which was vacated in a court of Leghorn, Lord Chancellor King held not only that the cause was to be determined by the *lex loci*, but the acceptance having been vacated by a competent jurisdiction, he thought the sentence conclusive, and that it bound the court of chancery in England. So Lord Hardwicke (1 Vez. 159, 1748,) decided, that if a marriage be declared valid, by the

Vandenheuvel v. The United Insurance Company.

sentence of a court in France having proper jurisdiction, it is conclusive ; and he held " that this was so, although in a foreign court, by the law of nations ; for otherwise the rights of mankind would be very precarious and uncertain."

This doctrine applies, with peculiar force, to the sentences of the courts of admiralty, in relation to *prize*, and of every court proceeding on the general law of nations, as the basis of its authority. While the capture of enemy-property is admitted to be the right of a belligerent party, the institution of courts to try the validity of such captures must also be admitted. They exist in every country, and are established in our own. The objects of their institution are every where the same. They are invested with similar powers, pursue the same principles, and profess to be governed by the same system of laws, unconnected with the municipal regulations of any country. In this manner, they form a separate and independent branch of judicature, and although uncontrolled by a common superior, their *determina- [*136] tions, while they act with good faith, will generally be uniform and consistent. Considering them in this light, acting on the same principles, and governed by the same law, they come within the reasons of the rule which is applied to domestic tribunals of concurrent jurisdiction, and their decisions ought to possess equal force and authority.

But another principle of English and American jurisprudence, arising from the nature of the subject and the system of our courts, appears to me strongly to enforce this doctrine. The question of neutrality is involved in the general question of *prize ;* it is a necessary incident, and the want of neutrality forms the principal ground of capture and condemnation. It is a settled maxim, that the courts of common law have no jurisdiction on the question of prize. It may collaterally arise, but *ex directo*, it is not within their cognizance ; it belongs solely and exclusively to the courts of admiralty as courts of prize. This is established by a current of authorities, both ancient and modern, and the reasons on which they are founded are satisfactory and conclu-

sive.   If, then, the courts of admiralty have exclusive juris-
diction of the principal question of *prize,* which necessarily
includes that of neutrality, and the courts of common law
have no jurisdiction, it must follow, that the decisions of the
former cannot be reviewed by the latter, and that whenever
they occur, directly or collaterally, they must, like the judg-
ment of other courts of peculiar jurisdiction, be considered
as conclusive.   If they were allowed to be reviewed, in what
manner could we ascertain the merits of the former decision ?
Is the same evidence in our power, or in the power of the
parties to obtain ?   The insured is a stranger to the transac-
tion ; the circumstances are unknown to him; the proofs, if
not detained abroad, are in the hands of his adversary ; they
are generally concealed, or may with the greatest ease, be
suppressed.   How could he compel their production, or bring
to light the merits of the case ?   To avoid these dif-
[*137]   culties, are *we to be governed by the written depo-
sitions taken in the admiralty abroad, or could they
be received as evidence ?   It is well known that the rules of
evidence in those courts are different from our own.   By
what rules are we to be governed ?   If exclusively by our
own, the result in our courts may differ, and yet both judg-
ments, as to the evidence on which they are founded, be
equally just.   Allowing even that the insured engages mere-
ly to furnish the evidence of this neutrality in foreign courts,
that evidence must surely be understood to be of a nature
usually received and demanded in those courts; for it is
there only that it can be material.   The engagement, relating
to such evidence, of course, excludes the idea of a decision
upon any other, and the interference of a court of common
law, requiring a different mode of proof, and acting on dif-
ferent principles, would contravene one of the direct objects
of the stipulation.   In every shape, therefore, in which this
subject can be viewed, insuperable difficulties present them-
selves, and evince the propriety of considering the foreign
sentences as final.

    In England, this question is at rest, by direct decisions on
the point; but these decisions were principally made during

Vandenheuvel v. The United Insurance Company.

the period of our revolution, or subsequent to it. They possess, therefore, no conclusive authority, but under similar circumstances, are to be regarded as we regard the decisions of the courts of all enlightened nations, high evidence of the law on the subject.

The cases in the English courts previous to the revolution are, however, not wholly silent on the question; so far as they relate to the general principle, that the sentence or judgment of any court of competent jurisdiction is to be received as conclusive, they have already been noticed.

There are some which immediately apply to the sentences of foreign courts of admiralty. The first in which the effect of such sentences appears to have been immediately considered, was the case of *Newland* v. *Horseman*, (1 Vern. 21. 2 Ch. Ca. 74. S. C. 1681,) in chancery. That was on *a question of *freight*, which had been tried in    [*138] the court of admiralty at Barcelona, where an interlocutory judgment was given. Lord Chancellor Nottingham declared, that he would not slight their proceedings beyond sea, and if the damages had been there ascertained, or a peremptory sentence given, the same should have concluded all parties. The next case is that of *Hughes* v. *Cornelius*, (Carth. 32. 2 Show. 232. S. C. 1689,) in which, during a war between France and Holland, an English ship was taken by the French, under color of being Dutch, carried into France, and there condemned by the court of admiralty, as a Dutch prize. Afterwards, an Englishman bought this ship, and brought her into England, where the right owner instituted an action of trover for the ship against the purchaser. This matter being found specially, the defendant had judgment, " because the ship being condemned as a Dutch prize, this court will give credit to the sentence of the court of admiralty in France, and take it to be according to right, and will not examine their proceedings; for it would be very inconvenient if one kingdom should, by peculiar laws, correct the judgments and proceedings of the courts of another kingdom." In the Theory of Evidence, (an Irish ed. printed in 1761, p. 37,) a book considerably ancient, it is stated, that

" in an action on a policy of insurance, with a warranty that the ship was Swedish, the sentence of the French admiralty condemning the ship as English property was held to be conclusive." (Bull. 244.) The same case is repeated, *in hæc verba*, by Mr. Buller, in his Nisi Prius, and has received the sanction of his name. He cannot be understood to refer to the case of *Hughes* v. *Cornelius*, as has been suggested, for that was not of a Swedish ship, nor on a policy of insurance. There is still another case, (Park, 178, 3d ed. not elsewhere reported,) of *Fernandez* v. *De Costa*, in 4 Geo. III. before Lord Mansfield, at Nisi Prius, in which there was a warranty that the ship was Portuguese, and being condemned as not being Portuguese, in the admiralty [*139] courts of France, the sentence *of condemnation appears to have been considered as decisive in favor of the insurer. In that case, it seems, the law was received to be settled, as to the effect of the sentence, and the inquiry was confined to ascertain the ground on which it went.

In answer to the two former of those cases, a distinction has been taken between the direct and collateral effects of a foreign sentence ; that it is conclusive only as to the transfer of property, for the benefit of all claiming under it, but not so as to collateral parties. I do not perceive the force of this distinction. If well founded, it appears to me to operate in favor of the insurer. The insured, the professed owner of the property, must certainly be a direct party to the sentence, if any one is a party ; he, therefore, if any one, must be concluded. Besides, from the nature of the proceedings in courts of admiralty, which are *in rem*, all persons are considered as bound. The forms and manner of proceeding in those courts are founded on the idea of notice to all the world, and the operation of their sentences is deemed to be equally extensive. The distinction now attempted, I do not find to be supported by any authority, either before or since the revolution. Indeed, in England, the contrary rule prevails, both with respect to their domestic and foreign courts. It is general, that, " whenever a matter comes to be tried in a collateral way, the decree, sentence

or judgment of any court, ecclesiastical or civil, having competent jurisdiction, is conclusive evidence of such matter." (Theory of Ev. 37. Bull. 244. Amb. 762, 763, and the cases there cited. 2 Black. Rep. 977.) It is not material that the parties to the suit should have been parties to the sentence; the only qualification of the rule, I believe, is to be found in *Prudham* v. *Philips*, (Amb. 763,) where Chief Justice Willes, in the case of a judgment alleged to be *obtained by fraud*, in the ecclesiastical court, took a distinction in favor of a *stranger*, who could not come in and vacate or reverse the judgment, and, therefore, must of necessity be permitted to aver the fraud; but he *held that the party to the suit was bound by the sentence, [*140] in relation to all other persons, and could not give evidence of the fraud, but must apply to the court which pronounced the sentence, to vacate the judgment. It is, therefore, always sufficient, if the one against whom the sentence was offered, was a party.

I forbear particularly to examine the subsequent cases, (Doug. 544. Park, 359, 361, 362,) during our revolution, and since, which, if any doubt could before exist, have unequivocally settled the law in England. The principle on which they are founded, is, I think, sufficiently supported by the antecedent cases. The English courts appear to have viewed those cases in the same light, and without treating the question as *res integra*, have adopted the rule they prescribe. Indeed, from the time of Charles II. to the present period, it appears to have received a steady determination by the highest authorities in their courts. With them it seems never to have been much questioned, and, I conceive, the law with us must be deemed to be equally settled. It may be added, that the same point arose in Pennsylvania, (2 Dall. 51, 194, 195, 270,) and, although not directly decided, Judge Shippen inclined to consider the foreign sentence as conclusive against the insured.

In France, the law is undoubtedly otherwise settled. (Emerigon, 457 to 464. Val. 112, art. 48. See also Rocc. n. 54.) Their courts have adopted a different rule, at an

Vandenheuvel v. The United Insurance Company.

early period; and the authorities on which they proceed, in cases of new impression, would merit great attention and respect; but, independent of the circumstance that they impose no obligations on our courts, I think they do not comport with the sound interpretation of the contract, nor with the system of our jurisprudence. The English courts, on questions of commercial law, are to be regarded as at least equally enlightened and correct; and their authority, before the revolution, repeatedly sanctioned and confirmed by subsequent determinations, imposes an obligation which the former do not possess.

[*141]    *In every light, therefore, in which I have been able to view the subject, I am of opinion, that the foreign sentence ought to be deemed conclusive against the plaintiff's right to recover on the policy;

1. From the nature and import of the contract itself, by which I consider the insured to have guarantied his neutrality, and undertaken to maintain it, and, of course, liable to all the perils attending it.

2. Because the condemnation is to be considered as conclusive evidence of the want of neutrality, it being the sentence of a court, not only of a *competent*, but *exclusive* jurisdiction on the subject.

KENT, J.    This is an action on a policy upon the cargo and freight of the ship Astrea.

The facts are these:

The voyage was from New York to Corunna in Spain, and the ship was described as the good American ship the Astrea; and, previous to the time of signing the policy, the plaintiff, in a written application for the purpose, to the respective defendants, represented the property to be his own. The ship was captured on her voyage by a British frigate, carried into Gibraltar, and, by the court of vice-admiralty there, the ship and cargo were condemned as lawful prize, belonging at the time of her capture, to Spain, or to persons, being subjects of the king of Spain, or inhabiting within the territories of the king of Spain, enemies to the king of Great Britain.

Vandenheuvel v. The United Insurance Company.

If the plaintiff is not to be adjudged concluded by the sentence, it is then admitted in the case, to be a fact, that the ship and cargo were the plaintiff's property.

The plaintiff was born a subject of the United Netherlands, and became a citizen of the United States on the 3d day of June, 1793, and has since resided in the city of New York.

Upon these facts, the whole question between the parties turns upon the effect of the sentence of condemnation. *If that is to be deemed conclusive proof of [*142] the facts therein stated, the policy is void, by reason of a breach of warranty, and by reason of a *material misrepresentation*, which led the underwriters to compute the risk upon circumstances which did not exist.

The sentence substantially *falsifies* the representation ; for the persons, stated in the sentence as the owners of the property, and the plaintiff, were evidently understood and intended to be different persons.

After the opinion which I have already given upon the question, in the cases of *Ludlow* v. *Dale*, (1 Johns. Cases, 16,) and of *Goix* v. *Low*, (1 Johns. Cases, 341,) I might well be excused from entering again upon the subject, unless, in the mean time, I had seen sufficient reason to change that opinion. The question has, indeed, been since presented in a way the most propitious to a liberal reconsideration of its merits. The authorities and the principles they contain, have been examined at the bar, with a diligence and ability, that have greatly aided our researches, and thrown light on the avenues to truth. It seems, then, in a degree, due to the occasion, to the elaborate and anxious care which has been bestowed on the subject, that I should once more, but very briefly, and without recapitulating what I have before said, take some further notice of the argument.

The true point in controversy is not what *ought* to be, but what in fact *was*, the legal effect of a foreign sentence of condemnation, in a case like the present, by the common law, as understood and settled when our revolution began. I shall confine myself, in this opinion, to the examination of this *single* point.

Let us first inquire what is the effect of a domestic judgment.

It is laid down as a general rule, (Buller's N. P. 244, 245. Amb. 761. Freeman, 84. Str. 733. Harg. Law Tracts, 465, 469,) that whenever a matter comes to be tried in a collateral way, the final sentence of any court, having [*143] *competent authority, is conclusive evidence of the matter so determined, in all other courts having *concurrent* jurisdiction; for, it were very absurd, that the law should give a jurisdiction, and yet not suffer what is done by force of that jurisdiction to be full proof.

It has, however, been made a doubt by some, (Harg. 477; 3 Mod. 231;) whether such sentences be conclusive upon jurisdictions, having concurrent authority, or only *prima facie* evidence of the fact, although I think the better opinion is in favor of their conclusive effect.

But if a matter belongs to the jurisdiction of one court, so *peculiarly* as that other courts can only take cognizance of the same subject indirectly and incidentally, the rule is then more extensive and unequivocal. (Hargrave's Law Tracts, 452, 457, 470, 477.) The latter courts are bound by the sentence of the former, until it be reversed, although it be in a suit *in diverso intuitu*, if it be directly determined, and must give credit to it universally, and without exception.

This rule has been illustrated by the case of sentences in the ecclesiastical courts, touching marriages and wills; in the exchequer, touching the condemnation of forfeited goods; and in the admiralty, touching prizes, in all of which cases, those courts have exclusive jurisdiction.

In respect to the ecclesiastical courts, the authorities are numerous, and have spoke a uniform language from the time of Lord Coke to the present day. In two cases, to be found in his reports, (4 Co. 29, a. 7 Co. 43, b.) the judges determined that they were bound (although it was even against the reason of the law) to give faith and credit to the sentences of the ecclesiastical courts, for *cuilibet in sua arte perito est credendum ;* and that, if the ecclesiastical judge showeth

cause of his sentence, yet, forasmuch as he is judge of the original matter, they shall never examine the cause whether it be true or not.

All the subsequent cases say the same thing. (2 Lev. 14. 1 Freeman, 83. Carth. 225. 1 Salk. 290. Skin. 493. Str. 960, 661. Amb. 761. Harg. Law Tracts, from 452 to 479.)

*This conclusive effect of the sentences of the [*144] spiritual courts applies to *strangers* as well as to parties and privies. They are conclusive evidence of the fact against all the world. (Harg. 457, 471. Bull. N. P. 245.) In one of the cases from Coke, (4 Co. 29, a.) and in the case of *Hatfield* v. *Hatfield*, (Str. 691. 3 Bro. P. C. 62, S. C.) which was finally determined, on appeal, in the house of lords, in 1725, the sentence was held binding on strangers. In a case before Lord Hardwicke, and in a case before Chief Justice Willes, (Str. 690. Amb. 763,) strangers were allowed to use the sentence against those who were parties.

The same doctrine is established, in respect to condemnations in the exchequer. This fully appears from the case of *Scott* v. *Sherman*, (2 Black. Rep. 977,) in which it was held by Mr. Justice Blackstone, in a very elaborate argument, and in which all the court concurred, that the condemnation in the exchequer was conclusive ; not only *in rem*, but *in personam* ; not only as to the property vested in the crown, but as to every other collateral remedy ; not only as to the party to the suit, but as to the right owner, although no party, and against all the world. The seizure itself was held to be notice to the owner. (See 4 Term Rep. 161.) The law gives implicit credit to the judgments of competent courts ; and it was afterwards observed by Chief Justice De Grey, that the decision in that cause had been the uniform law for above a century. (2 Black. Rep. 1176.)

It seems to be everywhere taken for granted, that the sentences of admiralty courts are equally final.(b) (1 Show. 6. 3

(b) In *Kindersley* v. *Chase*, Park. Ins. 490, Sir Wm. Grant said : " It has been clearly settled, from the time of Lord Hale down to the present period, that a sentence of condemnation in a court of admiralty, when it proceeds on

Vandenheuvel v. The United Insurance Company.

Mod. 195, note. Harg. 467. 2 Ld. Raym. 893. 1 Ld. Raym. 724. Com. Dig. tit. Admiralty, E. 17.)

the ground of enemies property is conclusive, that the property belongs to enemies, and not only for the immediate purpose of such sentence, but is binding in all courts and against all persons. The sentence of a court of admiralty proceeding *in rem* must bind all parties, must bind all the world." And this doctrine " has been considered equally applicable to questions of warranty in actions on policies as to questions of property in actions of trover." Per Chambre, J. in *Lothian* v. *Henderson*, 3 B. & P. 513. *Hughes* v. *Cornelius*, 2 Show. 242.

Sentences of foreign prize courts are received in the courts of England, as conclusive evidence, in actions upon policies of insurance, between the assured and the underwriter on every subject immediately and properly within the jurisdiction of such foreign courts, and upon which they have professed to decide judicially ; *Christie* v. *Secretan*, 8 T. R. 196 ; *Kendersley* v. *Chase*, cited above ; *Bolton* v. *Gladstone*, 5 East, 155, 160, and 2 Taunt. 85 ; *Baring* v. *Royal Ex. Ass. Comp.* id. 99 ; *Lothian* v. *Henderson*, cited above ; *Baring* v. *Claggett*, 3 B. & P. 214 ; but only on those points ; *Christie* v. *Secretan, Fisher* v. *Ogle*, 1 Camp. 418. *Everth* v. *Hannum*, 2 Marsh. 72. *Marshall* v. *Parker*, 2 Camp. 70. *Barzillay* v. *Lewis*, Park. Ins. 469. *Baring* v. *Claggett. Saloucci* v. *Woodmas*, Park. Ins. 471. *Pollard* v. *Bell*, 8 T. R. 444. So in Massachusetts ; *Baxter* v. *New England Ins. Co.* 6 Mass. 277, where all the cases before that time are reviewed by Sedgwick, J. ; S. C. 7 Mass. 275. *Buttrick* v. *Allen*, 8 Mass. 273. *Bissell* v. *Briggs*, 9 Mass. 462, 464. So in Connecticut ; *Stewart* v. *Warner*, 1 Day, 142. *Brown* v. *Union Ins. Co.* 4 Day, 179. So in South Carolina ; *Groning* v. *Union Ins. Co.* 1 N. & McCord, 537. S. P. *Bailey* v. *So. Ca. Ins. Co.* id. 541, n. (b) ; and see *Jenkins* v. *Putnam*, 1 Bay, 8 ; and also *Williamson* v. *Tunno*, cited below. So held in the Supreme Court of the United States ; *Croudson* v. *Leonard*, 4 Cranch, 434 ; and see this principle affirmed in *Penhallow* v. *Doane's admrs.* 3 Dal. 85, 116. So in Pennsylvania ; *Brown* v. *Ins. Co. of Pa.* 4 Yeates, 119 ; S. C. nom. *Dempsy* v. *Ins. Co. of Pa.* 1 Binn. 299, in note ; but by the act of 1809, it is declared that no sentence of any foreign court, having or exercising jurisdiction of prize, should be conclusive in any case, except of the acts of such courts, provided that nothing in the act should be construed to impair or destroy the legal effects of such sentence on the property, and this is only where such courts are constituted according to the law of nations, and exercise their functions either in the belligerent country or in . the country of a co-belligerent or ally in the war ; *Oddy* v. *Bovill*, 2 East, 473 ; therefore a sentence pronounced by the authority of the capturing power, within the dominions of a neutral country to which the prize may have been taken, is illegal and consequently would not be admissible evidence to falsify the warrant of neutrality. *Donaldson* v. *Thompson*, 1 Camp. 429. *Havelock* v. *Rockwood*, 8 T. R. 268. *Case of Flad Oyen*, 8 T. R. 270, n. But such judgment is conclusive only where the essential requisities and for-

Vandenheuvel v. The United Insurance Company.

The rule, then, I have mentioned, in respect to do-

malities of judicial tribunals in civilized countries have been conformed to ; *Sawyer* v. *Maine F. & M. Ins. Co.* 12 Mass. 291 ; and only as to such matters as it clearly and positively decides. *Bailey* v. *So. Ca. Ins. Co.* 1 Tr. Con. Rep 381.

" Every foreign admiralty sentence must depend for its operation, upon the jurisdiction of the court pronouncing it. And all the cases agree, that where the doctrine as to the conclusiveness of these sentences prevails, it must be understood with the above qualification. If jurisdiction be wanting, all is wanting, and the whole proceeding will be regarded as utterly null and void. Nor is there any question, that upon both principle and authority, the court, before whom such sentence is sought to be used, has the right of examining freely into the matter, and deciding whether the foreign tribunal which pronounced the sentence had jurisdiction or not. See *Rose* v. *Himley*, 4 Cranch, 241, 268, *et seq.* Story's Confl. of Laws, 492, *et seq.* *Cherriot* v. *Foussat*, 3 Binn. 220. *The Ocean Ins. Co.* v. *Francis*, 2 Wend. 64. S. C. 6 Cowen, 404. *Hudson* v. *Gustier*, 4 Cranch, 293. 4 Cowen, 523, 524, note. 2 Ev. Poth. 355. *La Nereyda*, 8 Wheat. 108, 168. *Thomas* v. *Southard*, 2 Dana, 475, 482, 483.

"1st. Jurisdiction may depend, upon the state of the *res*, on which the sentence was designed to operate. Thus, if by any means whatever, a prize court should be induced to condemn, as prize of war, a vessel which was never captured, it could not be contended that such condemnation would change the property. *Rose* v. *Himely*, *supra*, per Marshall, C. J. Story's Confl. of Laws, 494. So, if the possession of the *res*, should be actually lost by the captor, as by recapture, escape, or voluntary discharge, the prize courts of the captor would thereby lose jurisdiction. 1 Kent's Comm. 359, 3 ed. *Hudson* v. *Guestier*, 4 Cranch, 293. *Jenkins* v. *Putnam*, 1 Bay, 8, 10. But the possession of the captor in a neutral port, the port of an ally, or of a nation under the control of the sovereign of the captor, is the possession of such sovereign, and the *res*, though remaining there, are within the jurisdiction of the courts of the captor. 1 Kent's Comm. 358, 359. Id. 104. *Hudson* v. *Guestier*, *supra*. *Williams* v. *Armroyd*, 7 Cranch, 432. *The Henrick and Maria*, 4 Rob. Adm. Rep. 43. 6 id. 138, note. *Cherriot* v. *Foussat*, 3 Binn. 220. *Page* v. *Lennox*, 15 Johns. 172. *Sheaff* v. *Seventy hogsheads*, Bee's Adm. Rep. 163. But see *Wheelwright* v. *Depeyster*, 1 Johns. 471.

" 2d. The jurisdiction of a foreign admiralty court, may depend upon its national character. Thus, the prize court of an ally of the captor has no right to condemn, 1 Kent's Comm. 103, 2d ed. ; and *a fortiori*, the court of a neutral cannot.

" 3d. The jurisdiction may, also, depend upon the place where the court sits. Thus, the prize court of the captor cannot act in a neutral territory, and if it do so, its proceedings will be deemed unauthorized and void. *Glass* v. *The sloop Betsey*, 3 Dall. 6. 1 Kent's Comm. 103, 2d ed. and the cases there

Vandenheuvel v. The United Insurance Company.

mestic judgments, has received all the sanction that a

cited. See also, the cases cited in the text. But the prize court of the captor may sit in the territory of an ally. 1 Kent's Comm. 103, 2d ed.

"4th. Jurisdiction may also depend upon the manner in which the court is constituted. Thus, where a condemnation was pronounced by a pretended Court of Admiralty at Galveztown, constituted by Commodore Aury, under the alleged authority of the Mexican republic, the Supreme Court of the United States said, that 'it did not recognize the existence of any Court of Admiralty, sitting at Galveztown, with authority to adjudicate on captures; nor had the government of the United States hitherto acknowledged the existence of any Mexican republic or state, at war with Spain; so that the court could not consider as legal, any acts done under the flag and commission of such republic or state.' *The Neuva and Liebre*, 6 Wheat. 193. 'I admit,' says Washington, J. in *Snell* v. *Faussat*, 1 Wash. C. C. Rep. 271, 274, 'that, where we find a condemnation by a foreign court, of the origin of which we are not informed, we ought to presume it a legitimate tribunal. But, when the source of its authority and constitution is stated, we ought to examine it, and if it be contrary to the usual mode of constituting courts, it shifts the burden of proof upon the party who would support the condemnation; particularly, as it is more easy to prove the legitimacy of the court, than to disprove it. We know that the appointment of courts is, in all civilized countries, by the sovereign power. This, however, may be lodged by the sovereign, in a subordinate civil officer; nay, in a military commander, if the sovereign so chooses. But this latter mode is so unusual, 'that when we hear of a court being constituted by a military commander; and particularly, where it is not clear that he was, at the time, commander-in-chief; it destroys the presumption of its legality, so as to require the party who would support the condemnation, to show that the court was instituted by lawful authority. S. C. 3 Binn. 239, note.

"'But even where the authority of the court has clearly emanated from the sovereign power of the nation, it is going too far to say, that its jurisdiction cannot be questioned. All nations are on an equality. If any one, then, should undertake to erect a jurisdiction in manifest violation of justice, general convenience, and long established principles, is this to be submitted to? Suppose a belligerent should direct officers to hold a prize court within the dominions of a neutral, without that neutral's consent; can it be doubted, whether the jurisdiction of such a court may be called in question? But, it is answered, that it is the business of the government, and not of courts of justice, to seek redress in case of these irregular acts of sovereigns. This answer does not appear satisfactory. Governments may certainly interfere with great propriety. But what are the courts to do, when the subject is brought before them in the course of the administration of justice? They cannot refuse to decide, and have no rule to govern their decisions, but the law of nations.' *Cherriot* v. *Foussat*, 3 Binn. 220, 251." Cowen & Hill's Notes to 1 Phill. Ev. 886. 1d. 880, *et.seq.* where the subject of sentences in courts of admiralty and foreign courts is fully considered.

continued train of decisions could possibly give it.(c)

If the sentence profess to be made on particular grounds which are set forth in the sentence, but which apparently do not authorize the condemnation, the sentence will not be conclusive as to such facts.  *Calvert* v. *Bovill*, 7 T. R. 523.  *Pollard* v. *Bell*, 8 id. 444.  Or if the sentence has not decided the question of property nor declared whether it be neutral, but condemned the property or prize, solely on the ground that the ship had violated an *ex parte* ordinance to which the neutral country had not ·assented, or on the ground of a foreign ordinance against the laws of nations, such a sentence though conclusive of the question of prize or no prize, would not be conclusive of the fact whether or not the ship were neutral.  *Pollard* v. *Bell*, cited above.  *Bird* v. *Appleton*, 8 T. R. 562.  *Baring* v. *Claggett*, cited above.  *Bolton* v. *Gladstone*, id.  If a ship insured is merely represented as neutral, a sentence of a foreign court of admiralty is not evidence to falsify the representation ; *Von Tungder* v. *Dubois*, 2 Camp. 151 ; unless it appears that the condemnation went on that ground.  *Bernardi* v. *Motteux*, 2 Dougl. 575.  S. P. *Saloucci* v. *Johnson*, 4 Dougl. 424.  '' It is well established that in order to conclude the parties from contesting the ground of condemnation in an English court of law, such ground must appear clearly upon the face of the sentence ; it must not be collected by inference only or left in uncertainty ;" Per Tindal, C. J. in *Dagleish* v. *Hodgson*, 7 Bing. 504 ; see also *Fisher* v. *Ogle*, 1 Camp. 418 ; *Calvert* v. *Bovill*, 7 T. R. 523 ; *Williamson* v. *Tunno*, 2 Bay, 3·38 ; *Blacklock* v. *Stewart*, 2 Bay, 363 ; thus when the decree stated that the vessel was condemned for a rescue from a belligerent captor *or otherwise* the assured was permitted to give evidence disproving the fact of such rescue. *Robison* v. *Jones*, 8 Mass. 536.

The decision of the Court of Errors in the principal case has been adhered to in all the subsequent cases in New York.  In the *New York Firemen Ins. Co.* v. *De Wolf*, 2 Cowen, 56, the Court of Errors refused to hear it questioned by counsel in argument.  The general rule as to the effect of the sentences of foreign prize courts in this state, is thus stated by Chancellor Walworth in *The Ocean Ins. Co.* v. *Francis*, 2 Wend. 64, 68.  " The sentence of a foreign court of admiralty, condemning the property, as a good and lawful prize, according to the law of nations, is conclusive *to change the property*, but is only a *prima facie* evidence of the facts on which condemnation purports to have been founded, and in a collateral action, such evidence may be rebutted by showing that no such facts did in reality exist."

(c) Mr. Smith, in his learned note to *Doe d. Christmas* v. *Oliver, Same* v. *Oliver and others, Dutchess of Kingston's case, Hughes* v. *Cornelius, and Trevivan* v. *Lawrence et al.* 2 Smith's Leading Cas. 417–437, remarks that " Decrees of the High Court of Chancery, which, although a superior court, seems not to be, at least upon its equity side, a court of record, (see Co. Litt. 260,) stand, nevertheless, on the same level with the judgments of the three superior courts of common law.  It is laid down in Buller's Nisi Prius, 243, that ' a decree in chancery may be given in evidence between the same parties, or any claiming under them, for their judgments must be of authority

We are next to see whether the same rule, as appearing to be directed by the same reason, has not been applied with equal uniformity to foreign judgments.

in those cases where the law gives them a jurisdiction ; for it were very absurd that this law should give them a jurisdiction, and yet not suffer what is done by force of that jurisdiction to be full proof. In the case of *Manchester Mills,* Dougl. 222, note 13, it was laid down by Lord Mansfield, that a " decree establishing a custom to send corn to be ground at a particular mill ought not to be controverted, nor the existence of the custom litigated any further before a jury ; and that such decree bound all persons of the same description with the original defendant." ' See also *Trotter* v. *Blake,* 2 Mod. 231.

" ' Judgments of the courts ecclesiastical are of two sorts—*in rem* and *inter partes.* A grant of *probate* or of *administration* is in the nature of a decree *in rem,* and actually invests the executor or administrator with the character which it declares to belong to him. Accordingly, such grant of probate or administration is conclusive against all the world. *Noel* v. *Wells,* 1 Lev. 235, 236. It may, indeed, be shown that the grant was revoked, for that is the further act of the same court, or that it was forged, for that shows it not to be the act of the court at all, or that it was granted by a court having no jurisdiction, for then it is a nonentity. But it cannot be shown that the testator was mad, or that *the will* was forged, for those facts might have been alleged in the Ecclesiastical Court in opposition to the grant of probate or administration. *Noel* v. *Wells, ubi supra.* On this ground it was that the Queen's Bench, in *Allen* v. *Dundas,* 3 T. R. 125, held, that payment of money to an executor who had obtained probate of a forged will, which was afterwards repealed, is a discharge to the party paying it ; since, the probate being conclusive evidence of the executorship as long as it remained unrepealed, the debtor would, when he was called upon to pay, have had no defence against an action, brought by the executor under the forged will. Mr. J. Buller in that case said, ' The first question to be considered is, *what is the effect of a probate ?* It has been contended by the counsel, first, that it is not a judicial act ; and, secondly, that it is not conclusive. But I am most clearly of opinion that it is a judicial act ; for the Ecclesiastical Court may hear and examine the witnesses on the different sides whether a will be or be not properly made. That is the only court which can pronounce whether or not the will is good, and the courts of common law have no jurisdiction over the subject. Secondly, the probate is conclusive till it is repealed ; and no court of common law can admit evidence to impeach it. Then this case was compared to a probate of a supposed will of a living person : but, in such a case, the Ecclesiastical Courts have no jurisdiction, and their probate can have no effect ; their jurisdiction is only to grant probate of the wills of *dead* persons. The distinction in this respect is this,—if they have jurisdiction, their sentence, as long as it stands unrepealed, shall avail in all other places ; if they have no jurisdiction, their whole proceedings are a nullity.'

" On the same principle, a sentence in a matrimonial suit is conclusive, for

Vandenheuvel v. The United Insurance Company.

*The most ancient case to be met with in the En-  [*145]
glish books, is the case of *Hughes* v. *Cornelius.*

it is an adjudication upon the *status* of the parties, see *Da Costa* v. *Villa Real,*
Str. 961 ; *Bunting's case,* 4 Co. 29 ; *Kenn's case,* 7 Co. 42 ; and see the in-
stances of sentences of deprivation collected by Lord Holt in his judgment in
*Phillips* v. *Bury,* 2 T. R. 346. But it is otherwise when the suit is for a jac-
titation of marriage ; for there the spiritual court does not intend to affect the
*status* of the parties by its decree, but merely to prevent one party from false-
ly asserting that a marriage happened under certain specified circumstances.
See the *Dutchess of Kingston's case,* and *quære* as to *Jones* v. *Bow,* Carth.
225.

" It need hardly be added, that such sentences do not, any more than the re-
cords of the superior courts, conclude as to matters which may or may not
have been controverted. See *Blackham's case,* 1 Salk. 200. *R.* v. *Inhab.
Wye,* 7 A. & E. 772.

" It is laid down in the *Duchess of Kingston's case* that the decree of the
spiritual court is not conclusive in a criminal proceeding ; and this is stated
to be upon grounds of public policy. It seems difficult, however, to support
this view on principle. A sentence in the spiritual court *inter partes* could
not indeed be conclusive in a criminal proceeding, because the parties litigant
would not have been the same in both courts. But it is difficult to see how a
decree *in rem,* which operates upon the *status* of the individual and *renders*
the fact what the court adjudicates it to be—it is difficult, I say, to see how
such a sentence can be otherwise than conclusive. In the *Dutchess of King-
ston's case* it was unnecessary to decide this point, the sentence being *in per-
sonam.* In *R.* v. *Buttery,* R. & R. C. C. 342, a probate was held not to be
conclusive evidence that the party who obtained it had not forged the will,
which may at first sight seem inconsistent with the doctrine in *Noel* v. *Wells,*
1 Lev. 236, above cited, viz. that the party in a civil action cannot avoid the
probate by showing the will to be forged. But, on consideration, the cases
will appear to be consistent ; for, in the civil suit, the evidence is offered for
the purpose of showing that the party who obtained probate *did not thereby
become executor,* which character the spiritual court has adjudged him to pos-
sess ; but, in the criminal case, the party offering the evidence admits the pro-
bate to be valid till repealed, admits the defendant to have thereby become
executor, but merely seeks to show what means he used in order to become
so ; which is no more than if he sought to prove that in the affidavit in which
the prisoner verified the scripts he had committed perjury. On the other
hand, in *R.* v. *Grundon,* Cowp. 315, a sentence of expulsion from a college
was held conclusive in answer to an indictment for an assault on the express
ground that it resembled a sentence of the spiritual court.

" In *R.* v. *Vincent,* 1 Str. 481, indeed, the doctrine of the conclusiveness of
the sentence was carried to a greater extent, and it seems to be impossible to
support that case consistently with *R.* v. *Buttery* and *R.* v. *Macnamara,* R.
& R. C. C. 342 ; the latter decisions are those which must be now regarded

Vandenheuvel v. The United Insurance Company.

(Raym. 473. 2 Show. 242. Skinner, 58, S. C.) Although the special verdict in that case falsified the sentence of con-

law, being not only later in date, but the decisions of nine judges; whereas *R.* v. *Vincent* was decided by C. J. King alone.

" The proposition that a judgment *in rem* is conclusive in a criminal proceeding may, at first sight, appear to involve hardship, but will not, I think, appear to do so when we shall have fully considered the manner in which its effect is limited by holding it conclusive only on the point decided.

" With regard to Courts of Admiralty, the rule with regard to their sentences is the same as that regarding the sentences of spiritual courts where their proceeding is *in rem;*—for instance, when a vessel is condemned *as prize,* it seems never to have been disputed that the sentence is conclusive upon all the world. See the notes to *Le Caux* v. *Eden,* Dougl. 614, in which is set out the elaborate judgment in *Lindo* v. *Rodney,* containing a learned inquiry into the nature of the Prize Court of Admiralty, and the distinction between it and the Instance Court.

" The *sentence of a college visiter* depriving or expelling is conclusive ; and it is apprehended is so against all the world, since the visiter's proceeding is *in rem,* and he pronounces operatively upon the *status* of the party deprived ; see *Phillips* v. *Bury,* Skinn. 417 ; Lord Raym. 5, which was decided by three judges, contrary to the opinion of Lord Holt, which opinion was, however, afterwards upheld on error. His lordship's argument is fully given in 2 T. R. 346, in which he assimilates the case to that of a sentence of deprivation by the Ecclesiastical Court, and cites numerous authorities to show that that has always been conclusive. In *Phillips* v. *Bury,* the sentence of deprivation passed upon the old rector was held conclusive in an ejectment by the new rector. In *R.* v. *Grundon,* Cowp. 315, the same point was decided upon an indictment for assaulting a fellow-commoner of Queen's, (who had been expelled,) and turning him out of the college garden.

" On the same principle the sentence of a court martial seems to be conclusive. See *Rex* v. *Suddis,* 1 East, 306 ; for this court, to use the words of Lord Loughborough, in *Grant* v. *Gould,* 2 H. Bl. 100, ' being established in this country by positive law, the proceedings of it must depend upon the same rules with all other courts which are instituted and have particular powers given to them.' See *In re John Walter Poe,* 5 B. & Adol. 681. *Hannaford* v. *Hunn,* 2 C. & P. 148, where the party relying on it having neglected to place it on the record, it was held on that account not to be an estoppel.

" Sentence of deprivation by a visiter appears to differ from the other cases above touched upon in this respect, viz., that it is the sentence of a tribunal which has in many instances been created by a private individual. This does not, however, seem to alter the principle ; for, though no private individual can create a court whose sentence shall have operation on the persons or properties of others, yet there is no reason why he should not create one having operation on his own ; unless, indeed, he introduce some term, inconsistent with public policy.

Vandenheuvel v. The United Insurance Company.

demnation in the French admiralty; yet the court admitted the sentence to be true; and although the suit was trover, in which, nothing but the direct effect of the sentence came necessarily into view; yet the court, in giving judgment, laid down this general doctrine, applicable equally to collateral effects; viz. that they ought to give credit to foreign sentences of admiralty, and take.them to be according to right, and not to examine into their proceedings; that this was agreeable to the *law of nations*, and sentences in courts of admiralty ought to bind generally, according to that law; that if the party was aggrieved he ought to petition the king, it being a matter of government, and if there appear cause, he will instruct his liege ambassador, and on failure of redress, will grant letters of reprisal.

This decision, and the principle contained in the judgment, were afterwards cited and sanctioned by Lord Holt, and again by Lord Hardwicke, and, lastly, by Professor Wooddeson, in the course of his Vinerian lectures. (Carth. 32. 1 Atk. 49. 2 Wood. 456.)

A similar doctrine has been repeatedly advanced, and whenever the occasion arose. Instances of this are to be met with in the successive decisions of the Chancellors Nottingham, King, and Hardwicke. (1 Vern. 21. 2 Str. 733. 1 Vezey, 159.)

" Thus, on the same ground on which a visiter's sentence is supported, stands the case of the trustees of a school dismissing the schoolmaster for misconduct. *Doe* v. *Haddon*, 3 Dougl. 310; and the ordinary case of an arbitrator, whose forum is a domestic one, constituted by the parties themselves who are bound by its award.

" It has never, that I am aware of, been decided, unless indeed *Hannaford* v. *Hunn* be a decision to that effect, that, where a decree in chancery, a sentence of the Ecclesiastical Court, or any other matter *quasi of record* is conclusive, any necessity exists of pleading it in order that it may be held so. This furnishes another argument against the reasoning on which *Goddard's case*.and *Vooght* v. *Winch*, are thought by some to have proceeded; for surely the obligation of the jury to find a true verdict is equally great, whether the matter offered as conclusive be a decree or a judgment. The rules which now regulate pleadings will probably compel parties to place them on the record oftener than heretofore." 2 Smith's Leading Cases, 445, *et seq*. See also Cowen & Hill's notes to 1 Phill. Ev. 854-880.

Vandenheuvel v. The United Insurance Company.

In the case of *Gage* v. *Bulkeley*, (Ridgeway, 266, 267,) before Lord Hardwicke, Sir D. Ryder, who was then attorney general, laid down the rule in its fullest latitude, and as being well established. He said that foreign judgments were received in England as conclusive evidence, and had the same regard paid to them, for the sake of justice and public convenience, as sentences given in the courts of admiralty, or ecclesiastical courts at home; and he cited the case of *Hamden* v. *The East India Company*, [*146] which was *determined upon appeal, in the house of lords; and on the ground, that the sentence of a Dutch admiralty was conclusive evidence, it being *res judicata*, and could not be unravelled or re-examined. Although what he said was merely *arguendo*, yet, coming from such an eminent counsel, and appearing to be taken for granted by the court, it is pretty good evidence of the prevailing sense on the subject.

Here we may also notice the answer of the judges (of whom Sir D. Ryder was one) to the Prussian memorial, as being a document of very high authority, and bearing on the question before us. (1 Col. Jurid. 101, 102, 106.) It is there stated, that prize courts are governed by the maritime law of nations; that in every country there is a court of review, to which the parties who think themselves aggrieved, may appeal; that if no appeal be offered, it is an acknowledgment of the justice of the sentence by the parties themselves, and is conclusive; that captures have been immemorially judged of in that way, in every country of Europe, and with the approbation of the powers at peace; that every other method and trial would be impracticable and unjust; and that, if prize courts proceed contrary to the law of nations, and treaties, *in re minime dubia*, then, and not till then, the neutral has a right to complain.

This answer, and the principle contained in the case of *Hughes* v. *Cornelius*, may be considered as a correct commentary on the law of nations, relative to the effect which judicial sentences in one country are to receive in the courts

of another. (Grotius, 1, 3, c. 2, s. 5. Vatt. 1, 2, s. 84, 85. Martens, 104, 105. Erskine's Institutes, vol. 2, 735.)

After such a repeated and general recognition of the principle, we are prepared to expect an application of it (for that is all that is now wanted) to a case precisely the same with the one before the court. We do, accordingly, find it stated as law, in Buller's Nisi Prius, (p. 244,) that in an action upon a policy of insurance, with a warranty that the ship was Swedish, the sentence of a French *admiralty [*147] court, condemning the ship as English property, was held conclusive evidence. The same case was previously stated in the Theory of Evidence,(a) (p. 37,) to have been decided; and Park give us a particular report of another decision of the like kind, before Lord Mansfield, at the sittings after Hilary Term, 4 Geo. III. in the case of *Fernandez* v. *De Costa.* A ship was insured, and warranted a Portuguese; she was libelled, and condemned in a French court, as not being Portuguese, and although the plaintiff gave partial evidence of her being Portuguese, yet, when the defendant produced the sentence, it concluded the cause.

Where, then, can we discover a doubt, as to what was the law at the time of our revolution? Upon what ground can we pause, even to raise a conjecture, whether the court of King's Bench, in the case of *Bernardi* v. *Motteux*, (Doug. 575,) being the first cause after the year 1776, created a new rule, when even the counsel for the plaintiff, at the very outset of the argument, admitted, that if the sentence of the French admiralty had proceeded on the ground of the property not being neutral, the plaintiff would have been concluded.

. Nor do I think that the English decisions, since the year 1776, are to be thrown *wholly* out of view, although they are confessedly of no binding authority.

In addition to the consideration of the well known character of their judges, we are to observe, that their tribunals and ours, study and pursue the same code of law and equity; and that they are certainly not more liable than we ourselves, to misapprehend the authentic records and oracles of the

(a) Published in 1761.

common law. If the question, therefore, were otherwise in-
volved *in doubt*, a series of uniform decisions in the English
courts, for the last twenty years, cannot but be considered,
and that, too, without being unduly addicted *jurare in verba
magistri*, as a very sufficient cause to remove it. (Doug.
575, 610, 614 to 617, 705. *Barzillay* v. *Lewis*, *De Souza*
v. *Ewer*, and *Saloucci* v. *Woodmason*, cited by Park. 7
Term Rep. 523, 681, 705. 8 Term Rep. 196, 232.)

[*148]    *Having thus ascertained, at least to my satisfac-
tion, that by the law, as it stood in 1776, a sentence
of condemnation abroad, on a direct point in question, is, in a
collateral suit by the insurer, conclusive evidence of a breach
of his warranty, so that no evidence can be admitted to im-
peach it, I have done all that I undertook to do. I might
here rest the argument. Whatever opinion may be enter-
tained, as to the justice or policy of the rule, is not to the pur-
pose. Our duty is *jus dicere, non jus dare*. I may be mis-
taken, but it appears, however, to me, that all the reasons
which have established the rule relative to domestic courts,
having exclusive jurisdiction of a subject, apply with *pecu-
liar force* to a case like the present.

Courts of law are inadequate to determine the question of
prize; and to overhaul the sentence is in reality trying that
question. The circumstances that go to constitute prize, are
oftentimes complex. The property may be deeply masked,
the papers double, or every requisite paper may be regular,
and yet the conduct of the master such as to cause the pro-
perty to *lose* its privilege of neutrality. None but a court
clothed with the mode of proof, the summary powers, the en-
larged discretion of a prize court, can seize and sift every cir-
cumstance. The maritime law of Europe has, therefore,
very wisely established a peculiar court, for the exclusive
jurisdiction of prize. It is there that the assured should
vindicate his property, and if aggrieved, he should carry his
appeal to a court of review. There is great weight in the
observation, that this is the true construction of the engage-
ment, on the part of the assured. By representing, or war-
ranting his property to be neutral, the assured undertakes,

not only that it is so in *fact*, but that it shall be *entitled* to neutral privilege, *throughout the voyage.* (8 Term Rep. 234, 444.) A *warranty* of neutrality, means that the ship shall maintain a neutral conduct, and not forfeit it during the voyage. To construe the engagement to be *less* than that, is in a great degree to render it idle and nugatory. "To implement this warranty," *says a very [*149] sensible writer on insurance, (Miller, p. 496,) "the ship or goods must be neutral, *in conception of that nation from whom danger of seizure is apprehended."* On such a representation, or warranty, the insurer lays out of view the risk of loss, by reason of the non-neutrality of property. That risk the assured takes upon himself, and having in his hands, exclusively, all the *means* to do it, he is bound to make good his *averment*, whenever, and wherever the neutrality of the property, or its privilege as such, is called in question. If he fails to do it, he must bear the loss ; and if foreign sentences were liable to be re-examined here, I should still incline to think, that in the case of an *express warranty*, the assured, and not the insurer, takes upon himself the risk of the condemnation, *right or wrong*. Whether that would, or would not be the case, on a *representation* merely, I am not as yet prepared to say ; and, therefore, in those suits, where there was no warranty, but only a representation, I should choose to rest my opinion, entirely on the first ground, of the faith due to the foreign sentence.

The result of my opinion, accordingly, is, that the plaintiff is not entitled to recover in this cause, beyond the return of his premium.

BENSON, J. The principal inquiry in this case is respecting the effect of a *foreign* condemnation; the property in the goods condemned being intended, in the insurance of them, as neutral, is not the condemnation conclusive against the assured? This question has heretofore come before us, but until the arguments which have taken place in the present cause, it does not appear to me to have been so fully examined as the difficulty and importance of it require.

A condemnation may be viewed, as consisting in its cause and in its principles, as to be discriminated from each other; and the principles may be divided into those which relate to the law, and those which relate to the fact, comprehending in the fact, the proofs.

[*150]      *The distinction between the cause, and the principles of a condemnation is exemplified in a case, read on the argument from a late English reporter, (7 Term Rep. 681, *Geyer* v. *Aguilar*,) where one of the judges distinguishes between them as here intended.   He thus expresses himself: ."The ground on which the courts of France proceeded, was, that this was a capture of *enemy's property ;* and it certainly is not contrary to the law of nations, to condemn a ship on that *ground.*   Whether or not those courts arrived at that conclusion by proper means, I am not at liberty to inquire."   This is as much as if he had said, the cause of the condemnation, as declared by the courts in France, is that the ship was enemy's property, and which is a sufficient cause of condemnation by the law of nations ; but what were the *principles* of the condemnation, namely, what were the proofs, or what was the fact, as found by those courts from the proofs, or what was the law as adjudged by them to arise from the fact, I am not at liberty to inquire.

Insurances may be divided into general and special.   A general insurance is where the perils insured against, are such as the law would imply from the nature of the contract of a marine insurance considered in itself, and supposing none to be expressed in the policy.   A special insurance is where, in addition to the implied perils, farther perils are expressed in the policy ; and they may either be specified, or the insurance may be against *all* perils.

We have had an instance of each kind of these special insurances ; of the latter, in the case of *Goix* v. *Knox*, (1 Johns. Cases, 337,) " where, besides the usual risks enumerated in printed policies, it was declared, by a clause in *writing*, that the assurance was to be against *all* risks."   And of the former, in the case of *Gardiner and others* v. *Smith*, (1 Johns.

Cases, 141,) where the insurance was against the risks, among others, " of *contraband and illicit trade*," and the goods were seized at Jamaica, while landing, and condemned as contraband and illicit, by the law of that place ; and cases may be supposed, where *although the proper-    [*151] ty is insured as neutral, the insurer may, neverthe-less, expressly take on himself the peril of condemnation, for breach of blockade, or for any other specified or enumerated cause ; and in every such case, should there be a condemna-tion, the assured must be allowed to show, either by the condemnation itself, if it furnishes the requisite evidence, and if not, then by such matter extraneous to it, as, under the circumstances of the case, may be admissible in evi-dence, that the condemnation was for some *one* of the causes specified in the policy ; and so far, and to that intent, doubt-less, the condemnation is examinable in the suit, by the insu-red against the insurer.

The cases at bar, are, as it respects the perils of condem-nation, cases of general insurance, as here explained.

Where the property is insured as neutral, the law intends not only that the neutrality, as an ingredient or quality in the property or ownership of the goods, then exists, but like-wise, that it shall be preserved during the continuance of the insurance ; and, consequently, that there shall not be any act or omission, either by the assured himself, or by others, whose acts or omissions may in that respect be deemed to affect him, to forfeit it ; and the neutrality constitutes, as it were, a *title*, the existence and preservation of which, either in himself, or in the other persons, if any, on whose ac-count the insurance may be made, or for whose benefit it may, in consequence of a subsequent transfer of the goods, be to enure, the assured is deemed to warrant ; and this warranty, from the assured to the insurer, is a condition of the insurance, or the indemnity from the insurer to the assured.

Every condemnation is either *rightful* or *wrongful*. If the captured goods, being duly defended in the court of the captors, by alleging and proving the title of the assured, as

above defined, should, notwithstanding, be condemned, the condemnation will be wrongful. Every other condemnation is to be taken as rightful, including a condemnation by default, no person appearing to defend the goods. [*152] *Where the condemnation is wrongful, it must be attributed either to the error of the *judge*, as it relates to the law, or as it relates to the fact as deduced from the proofs ; or to the error of the witnesses, as it relates to the proofs, in testifying differently from the truth ; and whether the error, either of the judge or witnesses, be innocent or wilful, can never affect the question, whether the assured hath or hath not a right to controvert the condemnation.

If the assured has any such right, he must have it either limitedly, to controvert the principles which relate to the law, and not those which relate to the fact; or those which relate to the fact, and not those which relate to the law ; if he is to controvert those which relate to the fact, still he is to be *confined* to the proofs as they were before the judge, by whom the condemnation was pronounced; or he must have the right *unlimitedly*, or, as it is expressed in the case of *Hughes* v. *Cornelius*, (2 Show. 232,) to controvert the condemnation, " *at large.*"

It will readily be perceived, that as the principal question, whether the assured is, or is not to be concluded by the condemnation, may be differently decided; so will the situation of the insurer be varied from certainty of safety, to the mere expectation or possibility of it. If the condemnation is to be conclusive against the assured, then, however, there may have happened a " capture, *a taking at sea,*" and so the case within the very terms of the policy; yet if, further, there has been a condemnation of the goods, the insurer is safe in an absolute sense ; but if the assured may controvert the condemnation, the safety of the insurer then becomes uncertain, of course; in like manner, though in less degree, may the situation of the insured be varied, as the several questions respecting the limitations of the right of the

assured to controvert the condemnation, may also be differently decided.

In some cases it may be more favorable for the insurer, that the assured should controvert the law and not the fact. In others, again, that he should controvert the fact and not *the law; and it must ever be most favorable to    [*153] the insurer, that the assured should be precluded from producing *new* proofs; and this difference of situation must be viewed as material, in the greater number of cases, which probably will happen ; not only so, but some may easily be conceived, where, as it respects the certainty, or possibility, that the assured can, or cannot succeed in showing the condemnation to be wrongful, may wholly depend on a different decision, one way or the other, of these questions, taken singly. Before, therefore, it can be declared that the right of the assured to controvert the condemnation is limited, the rule whereby *some* of the limitations of it here suggested are to be adopted, and others to be rejected, ought to be shown. It may, however, be safely asserted, that no such rule exists. The limitations themselves, or the distinctions, that where a judgment is alleged, the party against whom it is alleged may controvert it, as to the law, but not as to fact ; or as to fact, but not as to the law ; and if as to the fact, that he is still to be concluded as to the proof, are not known in the law ; and I cannot discern them, as to be inferred from any thing peculiar in the contract of insurance ; so that the right of the assured to controvert the condemnation not being susceptible of limitation, if, therefore, he has the right, he must have it, unlimitedly, or to controvert the condemnation *at large.*

It is now to be stated, that where the property is insured as enemy's property, and there is a capture by an enemy, the other belligerent party, it is inevitable that the goods will be actually and rightfully condemned. They are as much lost to the assured as if they were captured by a pirate; and they can never happen to be recovered by him except by recapture ; and he may, in such case, abandon instantly on the capture. But where the property is insured as neutral,

there are means, which, as to be distinguished from the forcible or physical means of recapture, may be denominated *moral means*, whereby, until a condemnation shall have taken place, it is *possible* the goods may be recovered.
[*154]     *There may be a claim and defence of them in the court of the captor. Although it is stated as *possible* only that the goods may, by a defence of them, be recovered; yet, if it was requisite to the argument, it might be stated as the intendment of law that it is *probable;* for if the title of the assured should be duly alleged and proved, and the goods should, notwithstanding, be condemned, the condemnation, as has been already stated, must then be attributed to the error, either of the judge or the witnesses, and the law will never presume error *beforehand.* If, however, there is a *possibility* only, that, by a defence of the goods, a condemnation of them may be prevented, it is sufficient to make it the duty, either of the assured or the insurer, to defend them, or to bear the loss, if they should be condemned undefended; but it will be perceived the law can never impose it on the insurer to defend them.

Where lands are granted with warranty, if the grantee is sued by a person, claiming a better title than the title of the grantor, he may, as it were, abandon to the grantor; he can compel him to appear in court, and defend the land; he may *vouch* him, and thereby substitute him as the defendant to abide the event of the suit, *"for loss or gain;"* and he is the party to be presumed best cognizant to the title. Such is the rule in a case of a warranty, in the nature of a general contract of indemnity, from a grantor to a grantee; but if the assured may abandon to the insurer on capture, and impose the defence of the goods on him, the rule will be reversed; the warran*tor* may then substitute the warran*ted*, as the defendant, and the defence of the title will then be imposed on the party to be presumed not only least *cognizant,* but even wholly *ignorant* of it.

The warranty in grant of land being an indemnity against the acts of others claiming by title, and consequently not against entries by persons not so claiming, nor against as-

Vandenheuvel v. United Insurance Company.

sumptions of the land by the public authority of the state, nor as to any matter which may happen to exist thereafter; it may be said to be an indemnity against title *only, and not against casualty; and, accordingly,    [*155] if there should be a judgment against the title of the grantor, whether rightful or wrongful, he is alike held to indemnify the grantee for the loss of the land; but where the property is insured as neutral, the warranty of the title, so far from being by the insurer to the assured, it is by the assured to the insurer; the insurance can be a warranty, or an indemnity, not against title, but against casualty only; against tortious acts of private persons, and so unauthorized by law, or the acts of the state, such as reprisals, embargoes, and impressments; the acts, in neither case, however, proceeding on a supposed total absence, or a defect, or forfeiture of the title, as warranted by the assured. Another consequence, therefore, of a supposed right in the assured to abandon, on the capture, and impose the defence of the goods on the insurer, will be, that the insurance will thereby be essentially changed from being an indemnity against casualty only, to be also an indemnity against title, and against a want of that very title, which, as has been stated, the assured warranted to be existing, and that it should be preserved.

Further, if the assured may abandon on the capture, he is entitled also, to sue for the loss, and the insurer must, accordingly, litigate the suit, in expectation that it may be in his power to prove either that the property was not neutral, or that the neutrality had been forfeited, and so a breach of the warranty, and involving as a consequence, that the goods may be righfully condemned; or he must pay the loss voluntarily, and also instantly; any credit allowed on the policy being wholly of special or positive contract or regulation, and not arising from the insurance considered in itself. If he litigates the suit on the policy, he must relinquish a defence of the goods in the court of the captor, or expose himself to the palpable incongruity of insisting, in the suit by the assured, that the goods may be rightfully condemned,

[*156] and of insisting, at the same time, in the suit by the captor, that they are neutral property; *that the neutrality has been preserved, and, therefore, that they cannot be rightfully condemned. On the other hand, if he voluntarily pays the loss, he then precludes himself from afterwards alleging a breach of warranty; for, although I forbear from giving an opinion whether the insurer can or cannot recover back the money paid for a loss, as having paid it, not knowing at the time, certain facts, which, if he had known, he might thereby have discharged himself from the insurance; yet, I have no difficulty in declaring, that the facts must be such as it may be supposed he could not be so apprized of them, as to be put on an inquiry, or to be on his guard respecting them, which, however, can never be said to be the case, where goods, being insured as neutral, are captured by a belligerent; for it is to be intended, as will be more particularly stated hereafter, that they were captured on the ground of being enemy's property, although insured in the name of a neutral. If the assured, therefore, will, notwithstanding, voluntarily pay the loss, he will then be deemed for ever to have waived or renounced his right to allege the breach of warranty. The case will be within the general rule, that if a party shall omit to allege a fact, existing at the time, and whereby he might have defended himself against a recovery, he shall not, as against the other party in the suit, be allowed to avail himself of it thereafter. This rule was recognized in the court of errors, in the case of *Le Guen* v. *Gouverneur and Kemble*, 1 Johns. Cases, 436, where the appellant having placed goods in the hands of the respondents, as his agents, to be sold, and having himself made a contract for the sale of them to Gomez & Co. but leaving the sale still to be perfected by the respondents, the notes given in payment, were, accordingly, made to them in their *own* names, and the vendees having, before the notes became payable, proceeded to France with the goods; he demanded from the respondents an authorization, to receive there, whatever sum should remain of the proceeds of the goods, so sold on his account, to the above vendees,

Vandenheuvel v. The United Insurance Company.

after first deducting *and reserving at their disposal,   [*157]
such sum as should be completely sufficient to cover
them, for the general balance of their account ; and they re-
fusing to give him the authorization, he brought a suit against
them in this court for the refusal, as for a breach of orders,
whereby they had become instantly liable for the value of
the *whole* of the sale, and on a special verdict he had judg-
ment, and to the amount so claimed by him.   The respon-
dents thereupon filed their bill in the court of chancery, to
the effect of a suit at law, to *recover back* a payment, to en-
join him from proceeding on the judgment, suggesting, that
subsequent thereto, on the trial in the suit which they had
brought on the notes against the vendees, a verdict had been
found for the defendants, on the sole ground of a fraud hav-
ing been practiced by the appellant in the sale of the goods,
by affirming or warranting them to be of a better kind or
quality than they were, and the chancellor ordered an issue at
law to try the fraud.   A question, however, was reserved by
the counsel of both parties, to be determined as a preliminary
to the trial, whether the respondents were not precluded by
the antecedent circumstances, from insisting upon the alleg-
ed fraud as a ground of relief?   The chancellor decreed they
were not so precluded, and confirmed the order for the trial,
and on the appeal, the decree was reversed, and the respon-
dents' bill in the court of chancery was ordered to be dis-
missed.   If, therefore, the assured may abandon on the cap-
ture ; and as the insurer must accept the abandonment, and
pay the loss, then, although it might afterwards be proved
*undeniably*, in the court of the captor, that the property was
not neutral, the insurer would, notwithstanding, be without
any means of restitution.

These considerations are sufficient to show that the assu-
red cannot abandon on the capture ; that it is necessary the
goods should be defended in the court of the captor ; that the
defence of them remains on him ; and that he cannot cast it
on the insurer.   It is, however, at the same time, to be
stated, that if, having made a defence in the *court   [*158]
of the captor, the assured may still afterwards con-

trovert the condemnation *at large*, in the suit on the policy, it is obvious such previous defence can be estimated as a mere formality only; that nothing is gained by it to the insurer, but that he is left in the like disadvantageous situation as if he, and not the assured, had to defend the goods in the court of the captor; for although in the suit on the policy, instead of *defending* he will have to *defeat* the title of the assured, still the one case, equally as the other, involves the truth or the falsehood of the *same* facts. The reasoning, therefore, from what has been stated, terminates in this conclusion, that the *right* of the assured to controvert the condemnation, if it does exist, can exist no otherwise than to controvert it, *at large ;* that it is his duty to defend the goods against a condemnation in the court of the captor, and that the right and the duty being incompatible, the right must be declared not possible to exist. Lest, however, the reasoning, as it may respect the question, whether the assured can or cannot abandon instantly on the capture, may be considered as inconclusive and unsatisfactory, unless it be shown when he can abandon, it may be requisite still briefly to state, that besides the case of a capture by an enemy, the opposite belligerent party, where the goods are insured as enemy's property, and that of a capture by a pirate, there is another case where the assured may abandon on the capture; that is, in case of a capture by way of reprisal, and which, indeed, is in the nature of a capture by an enemy. Every other capture being necessarily by a friend, in relation to the captured, must be intended to be in order that the goods are to be carried into a port of the captor, for a regular and authorized examination or adjudication, whether they are lawful prize or not, either as being *covertly enemy property,* or if neutral, that the neutrality has become forfeited; and the assured being held to follow the goods and defend them, and the condemnation being conclusive against him, should they be condemned, it results that he can abandon only in the [*159] event *of their being restored to him, and the voyage, in consequence of the capture and detention, *broken up ;* and if the insurer shall, thereupon, pay the loss,

then, whatever right or remedy there may be against the captor, will enure to his benefit.

*The* practice in France has been urged as a precedent ; and Emerigon has been read on the argument, to show what is there received as law on the subject. " The act of the prince is put in the class of casualties ; (*La classe des cas fortuits ;*) and such also is the case, (*Il en est de meme du fait,*) as to the unjust sentence of a magistrate ; and it is of no importance whether the injustice proceeds from the corruption of the judge, or his ignorance ; so that it is then certain, that the insurers shall answer for an unjust condemnation pronounced by the tribunal of the place into which the captured ship shall be carried ; judgments rendered by foreign tribunals being of no weight in France against Frenchmen, as the cause is to be decided anew : whence it follows, that a judgment of condemnation pronounced by an enemy tribunal, is no proof that there has been a concealment of the *real* person *for whose account* the insurance was made, (*que le veritable pour compte ait ete cache*) nor any title (*un titre*) which the insurer may allege to avoid paying the loss. (Emerigon, c. 12, s. 20.)

The last sentence may be expressed in other words ; " such is our interpretation of the contract between the assured and insurer, as to the right of the assured to controvert a foreign condemnation, the property being insured as neutral." The argument, as contained in what is here cited, is, that an insurance being an indemnity against casualty, and an unjust foreign condemnation being a casualty, an insurance is, therefore, an indemnity against an unjust foreign condemnation ; and the act of the prince being a casualty, the proof of the minor term in the syllogism consists in an assertion, that the act or unjust sentence of a magistrate, is to be classed, equally with the act of a prince, *among [*160] casualties ; whereas, it is difficult to conceive two acts less of the same class or nature, and especially as it repects assured and insurer, than the act of a prince in the exercise of mere sovereignty, arresting goods either for permanent appropriation, or for temporary use, or detention only,

and the act of the magistrate in function as a judge between captor and captured, condemning the goods as forfeited to the captors. The act of the prince is arbitrary, and can be justified only from necessity, or for reasons of state; and may consist with an admission of a perfect title to the goods in the captured, the person from whom they may be taken; whereas the act of the magistrate is judicial, and, if right, can be only so, as warranted by the law of property, and is in denial of the title of the captured. In case of an arrest by a prince, the right of action of the assured accrues by the arrest; and, therefore, whether it can be justified or not, is never brought into question; but where there is a condemnation by a magistrate, the right of action does not accrue by the condemnation itself; it can only be conceived to accrue by the supposed injustice of it. If the arrest, the act of the prince, is of that class of acts for which the insurer is to answer; then it is immaterial whether it is a foreign or domestic arrest, (if the term "domestic" may, for the sake of brevity, be used and applied to an arrest by a prince, and a condemnation by a magistrate, to distinguish it as having happened in the same, and not in a different nation from that where the assured shall have sued on the policy,) the insurer is equally to answer for the one as the other; but as it relates to a condemnation, the distinction between foreign and domestic is essential; the right, as contended for, being to controvert a foreign condemnation only; and consequently, a domestic condemnation is always to be received as conclusive against the assured. Hence it is evident, that if an unjust sentence of a magistrate is a casualty, for which the insurer is to answer, it cannot be so, as being of the same class with the act of the prince: or that if it should [*161] be *admitted to be a casualty, as being of the same class, or *like* an act of the prince, then, as the insurer is equally to answer for the arrest, whether it is domestic or foreign, so ought he, in like manner, to answer for the condemnation, whether it is domestic or foreign; and, therefore, that as far as the argument for the right of the assured to controvert a condemnation, depends on a supposed *similitude*

between an unjust condemnation by a magistrate, and an arrest by a prince, and so far as it also depends at the same time on the distinction between a foreign and domestic condemnation, and that the right is only to controvert the former but not the latter, it is at variance with, and, consequently, defeats itself.

Emerigon, in farther support of the assertion, "that an unjust condemnation is a casuality for which the insurer is to answer," refers to Roccus, Not. 54. "Merces captæ a potestate, seu judice justitiam administrante in illo loco, aut a populo, aut ab alia quacunque persona per vim, absque pretii solutione, tenentur assecuratores solvere æstimationem dominis mercium, facta prius per dominos mercium cessione ad beneficium assecuratorum pro recuperandis illis mercibus, vel pretio ipsorum a capientibus, ut probat Stracc : De Assecurat: Gloss: 20, et sequitur Joan : de Evia in Labyrint: Commer. naval: lib. 3, c. 14, numb. 27, et melius fundatur ex dictis a Santer : De Assecurat : pars 4, numb. 20, ubi adducit casum de injustitia facta, ab aliquo judice ex qua merces amittantur vel damnum aliquod sentiant, an comprehendatur sub promissione *casus fortuiti*, et assecurator teneatur ? Adducit Bart : in L: exceptione col : penult : in fin : ff : de fidejusso ; ubi illud, quod judex facta injuste, quoad partes, dicitur *casus fortuitus*, et pertinet ad emptorem rei, et sic videtur in assecuratione, quod pertinet ad illum qui in se suscepit *casum fortuitum*." I do not possess the authors here referred to by Roccus ; but I find the last, Bartolus, referred to by Perezius, a writer on the civil law. Recourse, therefore, must be had to that law to discover the evictions of the things sold, (the condemnation intended by him as *casualties (casus fortuiti)* and so belonging to the [*162] buyer, (*qui pertinent ad emptorem,*) to bear the loss himself, as distinguished from those for which the seller is to answer, in order thereby farther to discover whether in a suit judicially heard and determined between captor and captured, a condemnation of the goods as a prize to the captors, for want of title in the captured, and alleged to be wrongful, is an eviction of the captured, (the assured,) for which

the insurer is to answer? " Tenetur de evictione venditor—
Porro evicta re datur emptori actio adversum venditorem.
Est ex empto actio, quæ inest natura contractus—Cessat
evictionis præstatio ob culpam emptoris—Culpam commit-
tet emptor, neque de evictione agere potest, si, cum posset
venditori denunciare, non denunciaverit motam controver-
siam, utque judicio, adesset et rem defenderet; nam vendi-
tori poterat fuisse justa defensionis causa utpote *scienti
melius* rei a se venditæ *jus* et *conditionem*—Ac sic in causa
evictionis sententia lata contra emptorem ei sit *regressus*
contra venditorem, si *vocatus* ab emptore venditor in judicio
comparuerit ad *rei* defensionem eam que susceperit, quia
nihil est quod imputetur emptori, qui, ut requiritur, denun-
ciavit venditori motam litem, cui, quod eam defendere non
potuerit, imputandum erit." (Perezii Prælect: in lib. 8, cod.
tit. 45, de evictioneb.) From these passages, it is evident,
that the evictions, intended by Bartolus to be deemed *casual-
ties*, and so the loss by them to be borne by the buyer, must
be of a different class or kind from an eviction for the want
of title in the seller, he having been vouched to appear and
defend his title; (*vocatus ut in judicio compareat ad rei
defensionem;*) and the civil law, as to the warranty from
the seller to the buyer, in respect to the eviction, or other
act whereby the buyer may lose the thing sold, when the
loss is to be borne by the buyer, and when the seller is to
answer for it, being the same with our own law, it is not
necessary, as an answer to the argument, from the supposed
analogy between the case of seller and buyer, and the
[*163] case of assured and insurer, to add to what *has
already been stated in comparing or contrasting a
warranty in a grant of lands, with an insurance, the proper-
ty being insured as neutral; and it only remains to be re-
marked on Emerigon, considered as an *authority*, that Roc-
cus himself, on whom he relies, does not, by the act of the
judge in taking the goods, and for which the insurer is to
answer, intend a judicial act or procedure between captor
and captured, in a case of taking or capturing goods as law-
ful prize; the taking, as he describes it, being within the

Vandenheuvel v. The United Insurance Company

territory where the judge has jurisdiction; (*captæ judice justitiam administrante in illo loco*,) but a taking as a prize, it is to be supposed, would have been mentioned by him as a taking at sea. That the injustice of the taking consists in its being without paying for the goods; (*absque solutione pretii*,) necessarily importing that the captured, the person from whom they were taken, was entitled to be paid for them, and which again necessarily affirms his title to them; but when the goods are taken from the captured, and adjudged to the captors, the injustice, if any, as it respects the act of the judge, consists in an error in him, in disaffirming any title in the captured; but not in his awarding the goods to the captors, without any recompense to the captured. The official act, therefore, of the magistrate, in taking the goods, intended by Roccus, can be no other than an act in the nature of an impress, and for which the insurer is unquestionably to answer. To suppose an unjust sentence a casualty, so as that the insurer is to answer for it, is altogether fallacious; casualty being applicable only to a fact possible, that it will or will not happen, until it either shall have happened, or, by the intervening happening of some other fact, shall have become impossible ever to happen. In each case, however, it equally ceases to be casual; and becomes certain, in the one that it has happened, and in the other that it cannot ever happen; but such casualty is not applicable to the sentence of a judge on the question, whether it is just or unjust, or to any other mere opinion, whether it is right or wrong, declared
*on any subject. For although it may be afterwards   [*164] demonstrated that the opinion is right, or that it is
wrong; yet it never can become either certainly right or certainly wrong, as having before been casual, whether it would be right or whether it would be .wrong. It is true that the law has ordained that every judgment, until reversed, shall be taken to be certainly right; if it should be reversed, it is then to be taken as certainly wrong, and the judgment of reversal is to be taken as certainly right. If the judgment of reversal should be reversed, the first judgment being thereby

affirmed, is again to be taken as certainly right, and the judgment of reversal as certainly wrong; but this legal or artificial certainty is in no manner the same with that certainty existing in nature, and having as its opposite, casualty. Certainty, as opposed to casualty, is to be proved as a fact, to have either physically happened, or become impossible to happen; and is not to be demonstrated as a proposition, either morally right or morally wrong. The opinion whether a sentence is just or unjust, may be ambulatory forever. Thus it is manifest, that the practice in France is erroneous; and there is reason to suppose that it proceeded from a misapprehension of the very authorities cited to prove it to be warranted by law or principle. It, however, having obtained, and being established in fact, in the nature of a custom, or usage, it ought, perhaps, not to be changed there; for both parties being apprized of it, they can make their calculations, as to the risk and premium, accordingly; and in that view no injury will be produced by it; but it certainly can have no influence on the present inquiry, which is, as to the *true interpretation* of the contract, according to *universal* law, independent of any positive local practice whatever.

I will now briefly apply to the case of an insurance, the law, as declared in the case of *Hughes* v. *Cornelius*, already cited; it being the most ancient case in the books, as to the effect of a foreign condemnation; and the adjudica-
[*165]   tion *which took place in it, having never been questioned, the case is now to be viewed as of the highest authority.

The judges, in that case, not only assume it, that a domestic condemnation is to be received as conclusive; but they suppose that, therefore, a foreign condemnation ought likewise to be so received; they argue the conclusiveness of the latter from the conclusiveness of the former. They express themselves thus, "as we are to take notice of a sentence in the admiralty *here*, so ought we of those *abroad* in other nations, and we must not set them *at large* again." It is true, the question was only as to the *direct*, and not as to the *col-

*lateral* effect of a condemnation; but the reasoning with which the judges close their opinion, that a foreign condemnation is to be conclusive, as to the direct effect of it, namely, " that if the captured is aggrieved, he must apply himself to the king and council, and it being a matter of *government*, he will recommend it to his liege's ambassadors, if he see cause, and if not remedied, he may grant letters of marque and reprisal," will equally apply, that it is to be conclusive, as to the effect of it on an insurance; and not only contains a sufficient answer to the objections to receiving it as conclusive, as to such effect of it; but obviously supposes, that as to the several effects of a condemnation, in respect to the conclusiveness of it, there is no difference between them.

The objections to receiving a foreign condemnation as conclusive against the assured, if I have rightly understood them, and, indeed, as some of them are expressed by a late English writer, on the law of insurance, (Park, 363,) read on the argument, are, " that the judges of a foreign nation may possibly decide on their own municipal laws or ordinances, contravening, or not forming a part of the law of nations;" and further, that the judge of a belligerent nation cannot be viewed as standing indifferent between a neutral nation and his own, in deciding on the interfering rights of neutrals and belligerents, as depending on, or to be deduced from the *law of nations.*

*That even the most enlightened and upright  [*166] judges may oftentimes, and in a great degree, be under the influence of *national* partiality, can scarcely be denied; such is human nature; "*Parum cavet natura.*"  But can neutral nations say they are less susceptible of interest or passion, than belligerent nations ?. Is not the armed neutrality in Europe, in 1780, to compel the British to acknowledge and observe it as a principle of the law of nations, that free ships make free goods, a proof of directly the reverse ? Can our nation claim us, or can we claim ourselves, to be more free, than the judges of belligerent nations, from national partiality ?  If the assured is warranted in surmising a

partiality in the belligerent judge, is not the insurer equally warranted in surmising it in us; and consequently, will not justice between them as to the question, and according to its just and equal merits, whether the principles of the condemnation, as they relate to the law of nations, are right or wrong, be alike to be suspected as fallible when declared by us, as when declared by the judges of belligerent nations? But a sufficient, and, perhaps, the most proper answer to the whole of the objection, is furnished in substance, by the judges, in the opinion above cited, from the case of *Hughes* v. *Cornelius*, that if a judge of one nation, in a case of a capture at sea, will assume novel and false principles, as principles of the law of nations, or misapply, or unduly extend, or restrict such as may have been already received and sanctioned, or misinterpret a treaty, or decide wholly on the particular regulations of his own nation, repugnant to, or deviating from the law of nations, or by whatever other erroneous reasonings or means, considered as the principles relative to the law in the case, he shall come to it as a legal conclusion, that the goods captured ought to be condemned as prize, either as being enemy property, or for breach of blockade, or as being contraband of war, or for any other cause whatever, every such condemnation would be a [\*167] \*grievance on the captured, against which his nation is to claim and procure reparation for him. It would be perfectly a *casus fœderis*, a case where the nation, in virtue of the mutual obligation of allegiance and protection, between sovereign and subject, would be held to interfere and remonstrate against the principles of the condemnation; and insist that they be disavowed or renounced, and that reparation be made to the captured; who, instead of seeking for indemnity from an underwriter, through the medium of a court of justice, must seek for it from the foreign nation itself, through the medium of the government or sovereignty of his own nation.

I conclude, with remarking, that possibly, as I have already intimated, an insurer may, by special or express insurance, take on himself the peril of an unjust condemnation;

Vandenheuvel v. The United Insurance Company.

and something of that kind has been attempted, by inserting a clause in policies, to the following effect : " Warranted American property, and proof thereof to be made, if required, in New York only ; " but whether an insurance in this form, is sufficiently provisional or explicit? Whether it would be deemed to be against a condemnation for *any* cause, or against a condemnation for *some* causes only, and not *others ;* and if so, which the causes are, as to be discriminated from each other ; and especially, whether the assured may abandon on the capture, or whether he is not bound to follow the goods into the court of the captor, and there defend them ; or, in short whether it is not unavoidable, that the whole must be put on the simple footing of a *war premium,* and a *war risk ;* so that all understanding, representation, or warranty, that the property is neutral, and that the neutrality is to be preserved, and not forfeited, are to be altogether laid out of the contract between the parties ? are questions which I suggest, as probable to arise, but on which it is not necessary that I should express an opinion, in deciding the case at bar ; it being a case of general insurance, and where, for the *reasons I have assigned, my opinion is, that a foreign, equally as a domestic condemnation, is to be received as conclusive against the assured. [*168]

LANSING, Ch. J. not having heard the argument in the cause, gave no opinion.

LEWIS, J. absent.

Judgment for the defendants.(*a*)(*b*)

(*a*) See Duer on Insurance, vol. 2, p. 647, 721, 722, 929.

(*b*) " The doctrine on this subject, in England, has been carried quite as far, to say the least of it, as is consistent with sound policy. Sentences of foreign admiralty courts have been upheld and regarded as conclusive there, even while they were denounced as arbitrary—unjust,—proceeding ' upon worse than Algerine principles,'—' professing to follow the law, but in reality making it a stalking horse for an act of piracy.' See per Kenyon, C. J., *Geyer* v. *Aguilar,* 7 T. R. 691, 692.

" Some of the more modern cases speak in terms of regret, that the course of adjudication had been so liberal and unguarded. In *Fisher* v. *Ogle,* 1 Camp. 418, the action was on a policy of insurance upon the Juno, represented as an American ship, which had been condemned in a French court of

vice-admiralty at Martinique. The sentence was in these words:—' That it resulted evidently from the papers on board, that the expedition of the said ship Juno, her cargo, and the operations of her captain on the coast of Africa, were for account of the brothers Geddes, merchants of London, who had, to mask the English property of this outfit, borrowed the American flag and passport of the said ship Juno, and taken for their agent and partner, in the expedition, captain Fisher, furnished with a certificate of citizen of the United States.' It then went on to condemn the vessel and cargo, as ' good and valid prize,' without stating any specific ground of condemnation. Lord Ellenborough said, ' we show sufficient respect for French sentences, if we attach credit in our courts to what they distinctly say. It is often painful to go this length, considering the piratical way in which they proceed. But this sentence does not say that the ship was not American ; and it is not to be considered evidence of what it does not specifically affirm.' A verdict was found for the plaintiff, and on motion for a new trial his lordship further said,—' I must look to the adjudicative part of the sentence, and there I find nothing stated as to the ship or her cargo not being American. Have you any case in which it was held that the judges must fish for a meaning when a sentence of this kind is produced to them ? Here the foreign court seems not to have formed any settled opinion upon the subject, and not to have known or cared on what grounds it proceeded to a condemnation. It is by an overstrained comity, that these sentences are received as conclusive evidence of the facts which they positively aver, and upon which they specifically profess to be founded.' The other judges were of the same opinion, and the sentence was accordingly held not conclusive. Id. 420. In another cause, *Donaldson* v. *Thompson,* 1 Camp. 429, 432, Lord Ellenborough said, ' I am by no means disposed to extend the comity which has been shown to these sentences of foreign admiralty courts. I shall die, like Lord Thurlow, in the belief that they ought never to have been admitted. The doctrine in their favor rests upon an authority in Shower, *Hughes* v. *Cornelius,* 2 Show. 232, which does not fully support it ; and the practice of receiving them often leads to the greatest injustice.'

   " The English doctrine, however, after having been much controverted in this country, has, to a certain extent, received the deliberate sanction of many of our courts.. In the Supreme Court of the United States, in Massachusetts, Connecticut, South Carolina, and Louisiana, the sentence of a foreign court of admiralty condemning property for a breach of blockade, or as enemy's property, is conclusive evidence, as between the insured and underwriter, of the facts upon which it is founded. *Croudson* v. *Leonard,* 4 Cranch, 434. S. C. 1 Hall's Amer. Law Journal, 148. *Baxter* v. *The Marine Ins. Co.* 6 Mass. R. 277. S. C. 7 id. 275. *Brown* v. *The Union Ins. Co.* 4 Day, 179. *Stewart* v. *Warner,* 1 id. 142. Swift's Ev. 15, 16. *Starkie* v. *Woodward,* 1 Nott & M'Cord, 329, note. *Groning* v. *Union Ins. Co.* id. 537. *Drayton* ads. *Wells,* id. 409. *Campbell* v. *Williamson,* 2 Bay, 237. *Cucullu* v. *Louisiana Ins. Co.* 5 Martin's Lou. Rep. N. S. 464. *Blanque* v. *Peytavin,* 4 id. 458. *Zeno* v. *The Louisiana Ins. Co.* 2 Miller's Lou. Rep. 533.

   " So also in Maryland, formerly ; *Gray* v. *Swan,* 1 Har. & Johns. 142 ;

Vandenheuvel v. The United Insurance Company.

but now by statute such sentence has been reduced to the character of mere *prima facie* evidence. *The Maryland Ins. Co. and Phœnix Fire Ins. Co.* v. *Bathurst*, 5 Gill & Johns. 159.

"And in Pennsylvania the same doctrine prevailed for a time as in England; *Dempsey* v. *Ins. Co. of Pennsylvania*, 1 Binn. 299, note; see *Brown* v. *Ins. Co. of Pennsylvania*, 4 Yeates, 119; but the legislature there, likewise, have provided, that no sentence of a foreign prize court shall be conclusive of any facts, save the actings and doings of the court. See Starkie's Ev. 239, note 1.

"In New York, the rule is now well established, that although the sentence of condemnation by a foreign court of admiralty, is conclusive to change the property, yet it is only *prima facie* evidence of the facts upon which it purports to be founded; and in a collateral action, such evidence may be rebutted by showing that no such facts existed. *Vandenheuvel* v. *The United Ins. Co.* 2 Johns. Cas. 451. S. C. 2 Caines's Cas. in Err. 217. *New York Firemen Ins. Co.* v. *De Wolf*, 2 Cowen, 56. *Ocean Ins. Co.* v. *Francis*, 2 Wend. 64. *Radcliffe* v. *United Ins. Co.* 9 Johns. R. 277. *Johnston* v. *Ludlow*, 2 Johns .Cas. 481. *Laing* v. *United Ins. Co.* id. 487.

"The doctrine in Virginia is the same as in New York. *Bourke* v. *Granberry*, 1 Gilmer, 16.

"The sentence of a foreign court of admiralty is conclusive only as to what is positively affirmed in it, and not of that which can merely be gathered 'from it by inference. *Fisher* v. *Ogle*, 1 Camp. 418, stated *supra*. See also, *Horneyer* v. *Lushington*, 3 id. 88, 89. Roscoe on Ev. 103. *Dalgleish* v. *Hodgson*, 7 Bing. 495, S. P.

"And the court must look to the judicative part of it; for it will not be evidence of what is merely stated in the consideration part. *Christie* v. *Secretan*, 8 T. R. 192. 2 Ev. Poth. 355. See *Maryland and Phœnix Ins. Co*, v. *Bathurst*, 5 Gill & Johns. 159. *Robinson et al.* v. *Jones*, 8 Mass. R. 536.

"Like the judgment of a court of common law, it is, in general, conclusive as to its own correctness and the facts necessary to uphold it; but not as to facts without which it may have been rightly pronounced. *Maley* v. *Shattuck*, 3 Cranch, 458, 488.

"In New York, also, the Court of Errors have held, that a condemnation as 'lawful prize,' afforded *no judicial inference* of the vessel being enemy's property, as there may be other just causes of condemnation. *Goix* v. *Low*, 2 Johns. Cas. 480. And the reporter in a note to this case says—' From the cases of *Pollard* v. *Bell*, 8 Term Rep. 444, *Bird* v. *Appleton*, id. 562, and *Fisher* v. *Ogle*, 1 Camp. 418, it seems now to be the opinion of the English courts, that where the sentence of the foreign court of admiralty condemns merely as ' good and lawful prize,' without adverting to the question whether it is neutral or enemy's property, such sentence is not conclusive.' " Cowen & Hill's Notes to 1 Phill. Ev. 881, 882, 883; id. 880, *et seq.* where the subject of sentences in courts of admiralty and foreign courts is fully considered; see *supra*, 144, note (*b*).