JAMES KIMBALL *vs.* ÆTNA INSURANCE COMPANY.
SAME *vs.* SPRINGFIELD FIRE AND MARINE INSURANCE COMPANY

A policy of insurance which is issued upon a dwelling-house in consequence of an express oral promise, by the applicant, that it shall be occupied, will not be avoided by the failure to fulfil such promise, unless fraud is proved; even though the risk is thereby increased.

Two actions of contract on policies of insurance issued by the defendants respectively upon a dwelling-house of the plaintiff in Bradford, dated January 17th 1862, and payable in case of loss to Jacob Kimball, mortgagee.

The policy of the Ætna Company contained the following provisions : " It being covenanted as a condition of this contract that the company are not to be liable . . . . for loss or damage, if the assured in the written or verbal application for insurance makes any erroneous representation materially increasing the risk." " Any change within the control of the assured, material to the risk, shall avoid this policy."

The policy of the Springfield Company contained the following provisions : " If the situation or circumstances affecting the risk thereupon shall be so altered or changed by or with the advice, agency or consent of the assured, as to increase the risk thereupon . . . . the risk thereupon shall cease and determine, and the policy be null and void." " If the premises insured shall be vacated and so remain for thirty days, without notice to this company, this policy shall cease and determine."

The two actions were tried together in this court, before *Metcalf*, J., and the defendants offered to prove that they had issued previous policies on the same premises, which were to expire on the 17th of January 1862 ; that the house was then unoccupied ; that on the 6th of January 1862 an incendiary attempt was made to burn it, of which the plaintiff informed the agent of the defendants ; that on the 17th of January the plaintiff applied for a renewal of the policies to the agent, who informed him that unless the house was occupied he could not renew them without consulting the companies and stating al.

the facts, and in that case he did not think the companies would authorize him to insure the property at all, but if occupied it could be insured at the same rate as in previous years. The plaintiff said in reply that the agent might renew the policies as before, as the house would be occupied; that he had a man in view who was going to occupy it. The agent thereupon wrote and delivered the policies. The house remained unoccupied till June 26th 1862, when it was burned by an incendiary. It was admitted, for the purposes of this trial, that the occupancy of the house was a material fact, under the circumstances.

The judge ruled that the representations, if proved, would not constitute a legal defence, and instructed the jury to return verdicts for the plaintiff, which was accordingly done. The defendants alleged exceptions.

*J. W. Perry*, (*W. C. Endicott* with him,) for the defendants cited 1 Arnould on Ins. 498, 499 *g*; 1 Duer on Ins. 657, 658, 665, 680, 721, 725, 730, 731, 749–769; 1 Phil. Ins. § 553; *Houghton* v. *Manuf. Ins. Co.* 8 Met. 114; *Edwards* v. *Footner*, 1 Camp. 530.

*E. Avery*, (*S. B. Ives, Jr.* with him,) for the plaintiff.

GRAY, J. The ruling of the judge who presided at the trial was in accordance with the opinion which had been repeatedly expressed by this court in previous cases. *Higginson* v. *Dall*, 13 Mass. 99, 100. *Whitney* v. *Haven*, 13 Mass. 172. *Rice* v. *New England Ins. Co.* 4 Pick. 442, 443. *Bryant* v. *Ocean Ins. Co.* 22 Pick. 200. That opinion has been ingeniously and elaborately criticized and controverted by learned writers to whose commentaries the defendants have referred; but a careful re-examination has satisfied us that it is founded upon elementary principles of the law of insurance, and supported by the adjudged cases in England and in the United States.

The contract of insurance is a contract to indemnify the owner of certain property against certain risks. This contract is founded upon the representations previously made by the assured to the insurer. The condition and circumstances of the property are within the knowledge of the owner more than of the insurer, and must be truly represented by the former to the latter, in order that he may estimate the risk before entering into

the contract. In making this representation, the utmost good faith is required. If an existing fact material to the risk is misrepresented by the owner to the underwriter, the minds of the parties never meet, they agree on no subject matter to which the contract can attach, the contract founded on such misrepresentation never takes effect, the underwriter may treat it as a nullity, and the other party, unless chargeable with fraud, may recover back the premium. If representations, whether oral or written, concerning facts existing when the policy is signed, are false, it never has any existence as a contract, unless it contains in itself terms which expressly or by necessary implication waive or supersede the previous representations. If the representations are positive and not of mere opinion or belief, it matters not whether they are made at or before the time of the execution of the policy, nor whether they are expressed in the present or the future tense, if they relate to what the state of facts is or will be when the policy is executed and the risk of the underwriter begins. If the facts are then materially different from the representations, the whole foundation of the contract fails, the risk does not attach, the policy never becomes a contract between the parties. Representations of facts existing at the time of the execution of the policy need not be inserted in it; for they are not necessary parts of it, but, as is sometimes said, collateral to it. They are its foundation; and if the foundation does not exist, the superstructure does not arise. Falsehood in such representations is not shown to vary or add to the contract, or to terminate a contract which has once been made; but to show that no contract has ever existed.

The word "representations" has not always been confined in use to representations of facts existing at the time of making the policy; but has been sometimes extended to statements made by the assured concerning what is to happen during the term of the insurance; in other words, not to the present, but to the future not to facts which any human being knows or can know, but to matters of expectation or belief, or of promise and contract Such statements (when not expressed in the form of a distinct and explicit warranty which must be strictly complied with) are

sometimes called " promissory representations," to distinguish them from those relating to facts, or " affirmative representations." And these words express the distinction; the one is an affirmation of a fact existing when the contract begins; the other is a promise, to be performed after the contract has come into existence. Falsehood in the affirmation prevents the contract from ever having any life; breach of the promise could only bring it to a premature end. A promissory representation may be inserted in the policy itself; or it may be in the form of a written application for insurance, referred to in the policy in such a manner as to make it in law a part thereof; and in either case the whole instrument must be construed together. But this written instrument is the expression, and the only evidence, of the duties, obligations and promises to be performed by each party while the insurance continues. To make the continuance or termination of a written contract, which has once taken effect, dependent on the performance or breach of an earlier oral agreement, would be to violate a fundamental rule of evidence. A representation that a fact now exists may be either oral or written; for if it does not exist, there is nothing to which the contract can apply. But an oral representation as to a future fact, honestly made, can have no effect; for if it is a mere statement of an expectation, subsequent disappointment will not prove that it was untrue; and if it is a promise that a certain state of facts shall exist or continue during the term of the policy, it ought to be embodied in the written contract.

The distinction between representation of facts existing when the policy was signed, which, if untrue, would prevent its taking effect as a contract, and representation of what should exist in the future, which would not avoid the policy, if merely false and not fraudulent, was pointed out by Lord Mansfield. In the leading case of *Carter* v. *Boehm*, which was of an insurance of a fort in the East Indies against loss by capture by a foreign enemy, he laid down the general principles as to concealment or misrepresentation of existing facts, saying, " Insurance is a contract upon speculation The special facts, upon which the contingent chance is to be computed, lie most commonly in the

knowledge of the insured only; the underwriter trusts to his representation, and proceeds upon confidence that he does not keep back any circumstance in his knowledge, to mislead the underwriter into a belief that the circumstance does not exist, and to induce him to estimate the risk as if it did not exist. The keeping back such circumstance is a fraud, and therefore the policy is void. Although the suppression should happen through mistake, without any fraudulent intention; yet still the underwriter is deceived, and the policy is void, because the risk run is really different from the risk understood and intended to be run at the time of the agreement." 3 Burr. 1909. This last proposition is reported in slightly different language by Sir William Blackstone, thus: " If a concealment happens, without any fraudulent intention, by mistake of the principal or his agent, still the policy is void, because the risk which is run is not that which the underwriter intended." S. C. 1 W. Bl. 594. Lord Mansfield in the same opinion repeated the statement that concealment, whether designed and so fraudulent, or undesigned and materially changing the risk, would have the same effect, saying, " The question therefore must always be, whether there was, under all the circumstances, at the time the policy was underwritten, a fair representation; or a concealment, fraudulent, if designed; or, though not designed, varying materially the object of the policy, and changing the risk understood to be run." 3 Burr. 1911. In *Pawson* v. *Watson,* Cowp. 785, it was represented to Ewer, an underwriter on the Julius Cæsar, that " she mounts twelve guns and twenty men;" but to Watson and others only that she was " a ship of force." There were neither men nor guns on board at the time of the insurance; and at the time of her capture she had less than twelve carriage guns, and less than twenty able men, but so many swivels and boys as to be stronger than if she had had that number. The actions against all the underwriters were tried together, and the only question reserved for the whole court was, " whether the written instructions which were shown to the first underwriter are to be considered as a warranty inserted in the policy, which must be strictly complied with, or as a representation which could only

o

avoid the policy, if fraudulent;" and the court held them to be a representation only. Cowp. 786; S. C. 1 Doug. 11, *note*. But Lord Mansfield, in his report of the trial said that he was of opinion " that it would be of very dangerous consequence to add a conversation that passed at the time, as part of the written agreement;" " but, secondly, if these instructions were to be considered in the light of a fraudulent misrepresentation, they must be both material and fraudulent." Cowp. 786. And in delivering the opinion of the court, he said of the representation by the assured to Ewer, " There is no fraud in it, because it is a representation only of what in the then state of the ship they thought would be the truth; and in real truth the ship sailed with a larger force;" and that Ewer had " determined whether it should be in the policy or not, by not inserting it himself." Cowp. 789, 790. So in *Bize* v. *Fletcher*, 1 Doug. 285, 289; S. C. Park on Ins. (7th ed.) 314, 315; Lord Mansfield held that a representation, not made part of the policy, that the ship should go to China, could not, unless fraudulent, be introduced to limit the policy, which in terms extended to all ports and places beyond the Cape of Good Hope; and a verdict was found for the the plaintiff, and acquiesced in. The opinion of Lord Mansfield, that actual fraud was necessary to be proved in order to avoid a policy for a mistake in asserting " what would be the truth " in the future, is brought out still more clearly in a later case of misrepresentation of an existing fact, as to which it was held that if the assured made representations to the underwriter without knowing the truth, he took the risk upon himself, although there was no evidence of actual fraud; and Lord Mansfield pointed out the distinction that in the case of the Julius Cæsar the ship was only fitting out and had no guns or men on board when the insurance was made. *Macdowall* v. *Fraser*, 1 Doug. 261.

In *Driscol* v. *Passmore*, 1 B. & P. 200, in the common bench, no decision was made upon this question. There a vessel being about to sail from Lisbon to Madeira, thence to Saffi, and thence back to Lisbon, insurance on the freight from Saffi to Lisbon was applied for, without success, because of the distant period at which the risk was to begin; but was subsequently made, on

a representation of the intended round voyage, and that the ship had arrived at Madeira, and was about to proceed on her voyage immediately. The ship, on her arrival at Madeira, was obliged, by the refusal of the crew to go on to Saffi, to put back to Lisbon, and was thence ordered by the charterer to Saffi, and lost on her way back from Saffi to Lisbon. The only point decided was, that the voyage insured, being from Saffi to Lisbon only, was substantially performed. None of the judges suggested that subsequent non-compliance with an oral representation would defeat the policy. On the contrary, Eyre, C. J. said, " That representation was really true at the time that it was made, and the underwriter was to form his own conclusion of the time when the Timandra would arrive at Saffi. If the insurance was made on a representation which was true at the time, it will be difficult to state a case where subsequent events, not happening through misconduct, and not totally disappointing the voyage, will discharge the underwriter. He formed his judgment of the case, knowing that all was executory, and that an alteration might arise of a kind that might increase his risk, upon the representation made to him to underwrite." And in *Weston* v. *Emes*, 1 Taunt. 115, in the same court, the insurers offered to show that before the execution of a policy on goods for a certain voyage " in ship or ships," it was orally agreed that a particular ship should not be included. But the whole court " determined that the evidence could not be admitted, without abandoning in the case of policies the rule of evidence which prevails in all other cases ; and that it would be of the worst effect if a broker could be permitted to alter a policy by parol accounts of what passed when it was effected. The court also observed that Lord Mansfield says of misrepresentations that they must be of a matter collateral to the contract ; but that this was part of the contract."

In *Edwards* v. *Footner*, 1 Camp. 530, a week before the policy on the vessel was signed it was represented to the underwriter that she was to sail with two armed ships, and to carry ten guns and twenty-five men. The reporter, after stating this, simply says, " There was no evidence of any conversation upon the

subject having passed between the parties, either when the policy was signed, or in the intervening period. In fact, the Fanny sailed by herself, and carried only eight guns and seven-teen men." The report does not show whether the ship had or had not sailed when the policy was signed. The only point raised or denied was whether the court could look to the previ-ous conversation, or must be confined to what took place at the time of subscribing the policy ; and upon that Lord Ellenborough ruled that the previous conversation "must be referred to the policy, and treated as a representation which required to be substantially complied with on the part of the assured." But he gave no intimation that oral representations, made in good faith, of what should take place during the term of the insurance could be admitted to control the policy. And such a position could hardly be reconciled with the contemporaneous case of *Bowden* v. *Vaughan*, 10 East, 415, in which the owner of a cargo, applying for insurance, having represented that the ship would sail in a few days, the same eminent judge submitted to the jury, as the turning point in the case, the question whether the representation was made in good faith, advising them indeed to take into consideration that the owner of the goods had no control of the vessel, but not making that decisive of the case; and the jury having found that it was made in good faith, the court of king's bench gave judgment on the verdict for the plaintiff.

Lord Ellenborough's successor, Lord Tenterden, reaffirmed the distinction between oral representations as to the present, and as to the future condition of the subject insured. An ap-plicant for insurance on a ship represented to the underwriter, at the time of his signing the policy, that she was to carry only so much salt as would put her in ballast trim. The ship was in fact deeply laden with salt, but whether shipped before or after the representation did not appear. Lord Tenterden in-structed the jury to find for the defendant if they thought that a material misrepresentation was made as to the quantity then on board, but for the plaintiff if they thought that the represen-tation was respecting the cargo expected to be shipped. The

jury found that the misrepresentation was not material, on evidence which was thought sufficient by the full court, who on that ground refused a new trial, without passing upon this point. *Flinn* v. *Headlam*, 9 B. & C. 693. Upon the trial, within a month after the decision of this case, of an action upon another policy on the same ship, the evidence was similar, and the defence relied on was the misrepresentation that the salt would not exceed the amount necessary for ballast. But Lord Tenterden instructed the jury that the defendant would not be entitled to a verdict unless he satisfied them that there was a fraudulent misrepresentation of the cargo which the ship was to carry; that " the mere fact of a misrepresentation, without fraud, will not be enough to prevent the plaintiff's recovering; for the contract between the parties is the policy, which is in writing, and cannot be varied by parol." *Flinn* v. *Tobin*, Mood. & Malk. 367.

The case perhaps most often cited, as showing that an oral promissory representation may be set up to defeat a written policy, is *Dennistoun* v. *Lillie*, 3 Bligh, 202. But an examination of the facts of the case shows that the representation to the underwriters was in no sense promissory, or relating to anything after the execution of the policy. The representation was contained in a letter received and shown to the underwriters in June, which stated that the ship would sail from Nassau on the 1st of May; she had sailed on the 23d of April, and been lost on the 11th of May; so that the representation, as made to the underwriters, was an untrue statement of a past fact. It was so distinctly pleaded, as appears by the report of the same case in 1 Shaw's Appeal Cases, 23. Lord Eldon so treated it after the argument, stating the question to be " whether it is a representation of an expectation, or a statement as of a past fact, which is material to the risk." 3 Bligh, 209. In announcing his final opinion, he omitted the word " past," before " fact," and said, " There is a difference between the representation of an expectation and the representation of a fact. The former is immaterial, but the latter avoids the policy if the fact misrepresented be material to the risk." 3 Bligh, 210. Yet the report

clearly shows that the chancellor was merely reaffirming his original opinion ; and used " fact" as past, opposed to " expectation" which was future ; and did not intend to speak of anything in the future, which no human being could control, as a fact.

*Alsop* v, *Coit*, 12 Mass. 40, falls within the same class.    The vessel which was represented to sail with convoy had in fact sailed without convoy, and been captured when the representation was made.    Mr. Justice Jackson, delivering the opinion of the court, said, " The underwriter could not suppose, when signing such a policy, that the vessel had sailed two days before the letter was written, and that the frigates which were to protect her were still in port."    So in *Von Tungeln* v. *Dubois*, 2 Camp. 151 ; *Feise* v. *Parkinson*, 4 Taunt. 640 ; and *Vandenheuvel* v. *Church*, 2 Johns. Cas. 173, *n.*, the misrepresentations were as to the documents or national character of the ship at the time of the insurance.

In several of the cases cited by Mr. Duer, there was no oral representation whatever.    The decision in *Steel* v. *Lacy*, 3 Taunt. 290, 298, went upon the ground that, in the absence of all warranty or representation, a ship was bound to carry the documents necessary to establish her national character.    In *Vandenheuvel* v. *United Ins. Co.* 2 Johns. Cas. 127, the ship was warranted American on the face of the policy.    In *Murray* v. *Alsop*, 3 Johns. Cas. 47, the representation on which the policy issued was in writing, resembling the applications for insurance against fire recently in use in this commonwealth.

The law seems to be settled in New York in accordance with that of England and of Massachusetts.    In *Vandervoort* v. *Smith*, 2 Caines R. 155, it was held that a policy on a vessel " from New York to two ports on the coast of Brazil " could not be controlled by a previous statement of the assured to the underwriter that the ports were only four or five hours' sail apart, although the premium on such a risk would have been less. The case decided in the same year of *Suckley* v. *Delafield*, 2 Caines R. 222, in which a representation (whether oral or written does not appear) was held to have been substantially complied

with, contains no intimation of an opposite rule. In a subsequent case, singularly like those now before us, upon a policy of insurance on a house against loss by fire, the defendants proved that before obtaining the policy the plaintiff used a fireplace in the basement, and, on the defendants' refusing for that reason to insure, promised to abandon the use of the fireplace and use a stove instead, but did not keep this promise. The supreme court, without much consideration, citing no cases except *Edward* v. *Footner* and *Bize* v. *Fletcher*, and without any notice of the difficulty of controlling the performance of a written contract by a previous oral statement, held that the action could not be maintained. *Alston* v. *Mechanics' Ins. Co.* 1 Hill, (N. Y.,) 510. But this judgment was unanimously reversed by the court of errors, in accordance with a very able opinion of Chancellor Walworth. S. C. 4 Hill, 329. See also *Undelock* v. *Chenango County Ins. Co.* 2 Comst. 221; *Allegre* v. *Maryland Ins. Co.* 2 Gill & J. 136. We do not find that Mr. Duer's views have been approved in any court in New York, except in a single instance by one judge of the superior court of the city of New York, while Mr. Duer was a member of that court. *Bilbrough* v. *Metropolis Ins. Co.* 5 Duer R. 593.

In the cases now before us, there was no representation that the house was already occupied, and no representation or agreement that it should be occupied the instant the policies took effect. The plaintiff's statement was that " the house would be occupied; that he had a man in view who was going to occupy it." There is nothing to show that this statement was not made in the most perfect good faith. Giving it the strongest possible interpretation against the plaintiff, it was a promise that the house should be occupied within a reasonable time, and the policies attached as soon as they were made and continued in force until such reasonable time had elapsed. The policies, having once taken effect, cannot be terminated or avoided, in the absence of fraud, by the subsequent breach of an oral agreement made before they were executed. The cases come exactly within the rule laid down by Chief Justice Shaw, and confirmed by the opinion of the whole court, in *Bryant* v. *Ocean Ins. Co.* :

ᴷ The evidence offered was not admissible for any other purpose than to prove a fraudulent intent on the part of the insured to mislead the' defendants and to induce them to take the risk, or to take it at a lower premium than they otherwise would have done; as a representation, not of a fact, but of an intention, it did not avoid the policy, unless made with a fraudulent intent; as it related solely to the employment of the vessel within the time for which she was insured, it was not of an independent or collateral fact affecting the risk, but was embraced in the terms of the contract, and must be considered as absorbed in the contract afterwards formally executed, or as by mutual consent withdrawn and waived by the execution of the policy." 22 Pick. 201.

This subject illustrates the wisdom of the common law in taking for its guides judicial opinions, given after argument, under the responsibility of determining the rights of parties in actual controversies, rather than the theories of scholars and commentators, however learned or acute.

It may be added that the legislature of the Commonwealth seem to have assumed the law upon this question to be settled in favor of excluding such evidence as was here offered. Before the policies in suit were made, it was provided by *St.* 1861, *c.* 152, that in fire insurance, " the conditions of the insurance shall be stated in the body of the policy, and neither the application of the insured nor the by-laws of the company, as such, shall be considered as a warranty or part of the contract." The .egislature can hardly have contemplated that while separate writings should pass for nothing, oral promises might control the policy. *Exceptions overruled.*